Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant,*

  v.

COMPREHENSIVE DRUG TESTING,
INC.,

  *Defendant-Appellee.*

No. 05-10067

D.C. No.
MISC-04-234-SI

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

MAJOR LEAGUE BASEBALL PLAYERS
ASSOCIATION,
  *Petitioner-Appellee,*

  v.

UNITED STATES OF AMERICA,
  *Respondent-Appellant.*

No. 05-15006

D.C. No.
CV-04-00707-JCM

Appeal from the United States District Court
for the District of Nevada
James Mahan, District Judge, Presiding

IN RE: SEARCH WARRANTS EXECUTED
ON APRIL 8, 2004 AT CDT, INC.,

SEAL 1,

              *Plaintiff-Appellant,*

              v.

SEAL 2,

              *Defendant-Appellee.*

No. 05-55354

D.C. No.
CV-04-02887-FMC

ORDER AND
SUPERSEDING
OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
November 15, 2005—San Francisco, California

Filed January 24, 2008

Before: Diarmuid F. O'Scannlain, Sidney R. Thomas, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge Thomas

## COUNSEL

Erika R. Frick, Assistant United States Attorney, San Francisco, California, argued the cause for defendant-appellant, United States of America; United States Attorney Kevin V. Ryan, Appellate Chief Hannah Horsley, Assistant United States Attorney Barbara J. Valliere, San Francisco, California; and Assistant United States Attorneys Matthew A. Parrella, Ross W. Nadel, Jeffrey D. Nedrow, Carter M. Stewart, San Jose, California, were on the briefs.

Elliot R. Peters, Keker & Van Nest, LLP, San Francisco, California, argued the cause for defendants-appellees Comprehensive Drug Testing, Inc. and Major League Baseball Players Association; Ethan A. Balogh, Keker & Van Nest, LLP, San Francisco, California, and David P. Bancroft and Jeffrey C. Hallam, Sideman & Bancroft, LLP, San Francisco, California, were on the brief.

## ORDER

The petitions for panel rehearing are GRANTED. The opinion and dissent filed on December 27, 2006, are withdrawn. The superseding opinion and dissenting opinion of Judge Thomas will be filed concurrently with this order.

The petition for rehearing en banc is DENIED as moot. Further petitions for rehearing or rehearing en banc may be filed.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the United States may retain evidence it seized from Major League Baseball's drug testing administrator, and enforce an additional subpoena, as part of an ongoing grand jury investigation into illegal steroid use by professional athletes.

I

These three consolidated cases arise from the federal investigation of the Bay Area Lab Cooperative ("Balco") and its alleged distribution of illegal steroids to enhance the performance of professional baseball athletes. The investigation began in August 2002 and, over the following several years, produced evidence—including grand jury testimony—establishing probable cause to believe that at least 10 major league baseball players received illegal steroids from Balco. Today we decide the government's appeals from the separate adverse orders of three different district courts: (1) an order by Judge Florence-Marie Cooper in the Central District of California, denying reconsideration of her earlier order requiring the government to return property seized from Comprehensive Drug Testing, Inc. in Long Beach, California ("CDT"),[1] (2) an order by Judge James Mahan in the District of Nevada, requiring the government to return property seized from Quest Diagnostics, Inc. in Las Vegas, Nevada ("Quest"),[2] and (3) an order by Judge Susan Illston in the Northern District of California, quashing the government's May 6, 2004, subpoenas to CDT and Quest that related to the grand jury sitting in San Francisco, California.

---

[1]The court also required the government to turn over all notes made by agents who reviewed the challenged evidence.

[2]Again, the court required the government to give up all notes made by reviewing agents.

A

As part of its investigation into Balco, the government in November 2003 served a grand jury subpoena on Major League Baseball ("MLB"),[3] seeking drug testing information for 11 players[4] with connections to Balco. One month later, MLB responded that it had no such information.

The government then reasoned that because CDT[5] and Quest[6] had tested urine samples from MLB players during 2003, those entities—rather than MLB—had to possess the samples and testing records in question. Therefore, the government issued subpoenas both to CDT and to Quest, seeking drug testing information for all MLB players. The subpoenas were returnable on February 5, 2004, but the government extended that date to March 4, 2004, after CDT and Quest promised not to destroy or to alter any of the evidence requested.

Despite protracted negotiations, CDT and Quest resisted producing any of the subpoenaed materials, explaining that they would fight production of even a single drug test all the

---

[3]"Major League Baseball," an unincorporated association, consists of two professional baseball leagues—the National League of Professional Baseball Clubs and the American League of Professional Baseball Clubs.

[4]The names of the players are under seal and are not disclosed in this opinion.

[5]CDT is a third-party administrator of "drug and alcohol testing programs" that was hired to oversee MLB's drug use evaluation program. The company includes "top experts in pharmacology, forensic toxicology, laboratory management, medical review, legal, and administrative compliance." Comprehensive Drug Testing: About Us, http://www.cdtsolutions.com/about_us.html (last visited June 13, 2007).

[6]Quest offers laboratories that conduct "drugs of abuse testing and therapeutic drug monitoring" with "the most advanced methodologies available." Quest Diagnostics: Diagnostic Testing & Services, http://www.questdiagnostics.com/brand/business/b_bus_lab_index.html (last visited June 13, 2007). Quest's laboratory in Las Vegas performed the drug testing on the player specimens at issue in these consolidated appeals.

way to the Supreme Court. Following further negotiations, the government, believing that a narrower subpoena might be effective, issued new subpoenas on March 3, 2004, seeking documents related only to eleven[7] players with Balco connections. These new subpoenas were returnable on April 8, 2004.

Two days before the new return date, the Major League Baseball Players' Association—the union representing athletes who play for Major League Baseball[8]—informed the government that it intended to file a motion to quash the subpoenas. The following day, as promised, CDT and the Players Association filed such a motion in the Northern District of California before United States District Judge Jeffrey White.

B

After learning of the planned motion to quash, the government applied on April 7, 2004, for warrants to search CDT's Long Beach office and Quest's Las Vegas laboratory. The government expected to find testing evidence at both locations and knew that the information at CDT would be needed to obtain all relevant records from Quest, because Quest stored each testing record by code, not name, and CDT possessed the information identifying the code(s) that corresponded to each player in its testing program. Upon a showing of probable cause,[9] Magistrate Judge Jeffrey Johnson in the Central District of California issued a search warrant for the CDT office,[10] and Magistrate Judge Lawrence Leavitt

---

[7]The government later decided not to seek drug testing evidence related to one of the eleven players, and on April 22, 2004, sent a letter to counsel for CDT withdrawing requests for documents related to that player.

[8]The testing records at issue in these cases were created pursuant to a collective bargaining agreement between Major League Baseball and the players of Major League Baseball (represented by the Major League Baseball Players' Association).

[9]No party disputes the existence of probable cause to support the April 7, 2004, warrants.

[10]The warrant was not limited to the identifying numbers of the ten players, although those numbers were integral to obtaining meaningful information from Quest and thus played a special role in the investigation.

in the District of Nevada issued a search warrant for the Quest laboratory.[11] Affidavits submitted to support the warrants informed both magistrates that the information sought was already the subject of grand jury subpoenas and that a motion to quash was expected.[12] Contrary to the arguments of the Players Association and CDT, the government did not premise its April search warrant affidavits on a claim that the evidence was in danger of being destroyed.[13]

The April 7 warrants authorized the seizure of drug testing records and specimens for ten named Balco-connected players, as well as "[a]ll manuals, pamphlets, booklets, contracts, agreements and any other materials detailing or explaining" CDT's or Quest's "administration of Major League Baseball's drug testing program."[14] The warrants also authorized the search of computer equipment, computer storage devices, and

---

[11]Federal Rule of Criminal Procedure 41(b) authorizes the government to pursue search warrants in different districts. The rule gives a magistrate judge the authority "to issue a warrant to search for and seize a person or property located within the district," "to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed," or "in an investigation of domestic terrorism or international terrorism . . . [to] issue a warrant for a person or property within or outside that district." Fed. R. Crim. P. 41(b).

[12]*See infra* pp. 1109-1110.

[13]Loss of electronic evidence during delays in litigation is a considerable risk. In its recent publication advising judges on how to manage electronic discovery in civil cases, the Federal Judicial Center explained that judges should consider "preservation order[s]" to "minimize the risk that relevant evidence will be deliberately or inadvertently destroyed" and to "help ensure information is retrieved when it is most accessible (i.e., before it has been deleted or removed from active online data)." Federal Judicial Center, *Managing Discovery of Electronic Information: A Pocket Guide for Judges* 17 (eds. Barbara Rothstein, Ronald J. Hedges & Elizabeth C. Wiggins) (2007) [hereinafter "*Managing Discovery*"].

[14]The warrant also expressly authorized the seizure of "correspondence" and "e-mails" detailing or explaining Quest's administration of the drug testing program.

—where an on site search would be impracticable—seizure of either a copy of all data or the computer equipment itself. "[L]aw enforcement personnel trained in searching and seizing computer data" (designated "computer personnel") were responsible for choosing the appropriate course of action to capture the electronic data sought. If seizure of all data or equipment was necessary, "appropriately trained personnel" would review the data, retaining the evidence authorized by the warrant and designating the remainder for return.

On the morning of April 8, 2004, Special Agent Jeff Novitzky (the lead case agent) and eleven other federal agents —including Computer Investigative Specialist Agent Joseph Abboud—executed the search warrant for CDT's Long Beach office. Although CDT personnel were initially cooperative, one of CDT's directors—after speaking with counsel—informed Agent Novitzky that CDT would not assist federal officers in locating the evidence they were authorized to seize and that the agents should "do what they needed to do." When informed that agents might be forced to seize all computer equipment for up to sixty days, the director again contacted counsel, exclaiming that such a seizure would "shut[ ] the business down."

Throughout the morning and early afternoon, Agent Novitzky spoke several times with CDT's attorney, David Bancroft. Bancroft asked Agent Novitzky not to seize anything while he attempted to work out a beneficial solution with the United States Attorney's Office in San Francisco. Later, Bancroft told the agent that CDT had only one hardcopy document eligible for seizure. Around noon, both Agent Novitzky and Assistant United States Attorney Jeff Nedrow spoke with Bancroft and CDT's directors via conference call. Bancroft emphasized that any help CDT provided should not be construed to constitute consent and then informed Nedrow and Agent Novitzky that CDT had two computers on which agents would find information relevant to the search warrant.

During this conference call, Agent Novitzky learned that agents had discovered a hard-copy document with names and identifying numbers for all MLB players, including some of the ten named Balco players. Agent Novitzky faxed the document, which was not the "only document eligible for seizure" to which Bancroft had alluded, to Nedrow for preparation of another search warrant to seize specimen samples from Quest based on the identifying numbers. One of CDT's directors became visibly upset when she noticed the document being faxed. She left the premises, but when she returned, she opened a locked drawer and presented agents with a document that contained drug test results for the ten named Balco players—the document previously described as the only seizable hard-copy document on site.[15]

At 2:35 p.m., a CDT director finally identified a computer directory containing all of the computer files for CDT's sports drug testing programs. This directory, labeled "Tracey," contained numerous subdirectories and hundreds of files. Seeing this, Agent Abboud recommended copying the entire directory for off-site analysis, because of the time and intrusiveness involved in searching the voluminous directory on site. The warrant had anticipated that such removal might be necessary, and provided:

> If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time, then the computer personnel will determine whether it is practical to copy the data during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve the data.

[15]Some time later, agents located a billing document for CDT's off-site Long Beach storage locker. Only after agents obtained a fourth warrant from Magistrate Judge Johnson on April 8, 2004, allowing them to search and seize evidence in the locker, did a CDT director agree to open the locker for the agents.

The agents copied the directory and removed the copy for later review at government offices.[16]

The search of the CDT facility concluded shortly after 5 p.m., but before he left the premises, Agent Novitzky reviewed with CDT directors the evidence seized during the search. The documents seized included a 25-page master list of all MLB players tested during the 2003 season and a 34-page list of positive drug test results for eight of the ten named Balco players, intermingled with positive results for 26 other players.[17] Upon returning to his office in San Jose, California, Agent Novitzky briefly reviewed the contents of the Tracey directory, identifying five subdirectories related to MLB. Within these directories, Agent Novitzky identified files authorized by magistrate judges for seizure, including the master file of positive drug test results.

During the time in which Agent Novitzky and others were searching CDT on April 8, 2004, another group of federal agents had executed simultaneously a separate search warrant at Quest's laboratory in the District of Nevada. However, these agents were unable to locate the specimens that the warrant authorized them to seize, because the search warrant in the District of Nevada listed the players by name, and the Quest specimens were identified only by number.

Quest employees informed the searching agents in the District of Nevada that the records associating the players with their identifying numbers could be found in files stored by

---

[16]The warrant also provided for the circumstances in which "computer personnel determine it is not practical to perform an on-site search or make an on-site copy of the data within a reasonable amount of time," and then allowed "the computer equipment and storage devices [to] be seized and transported to an appropriate law enforcement laboratory for review." The agents did not make use of this procedure, however, because Agent Abboud determined that copying the data was possible.

[17]Copies of all seized documents were provided to CDT by the government on April 16, 2004.

CDT. Indeed, these records soon were discovered by agents at CDT and faxed to the agents at Quest.[18] With this information, the agents in the District of Nevada applied for a third search warrant to seize the relevant items identified by number as well as by name. Judge Leavitt authorized this third warrant at 6 p.m. on April 8, 2004, and agents seized from Quest the then-identifiable Balco players' specimens later that same night.

C

On April 26, 2004, the Players Association filed motions under Fed. R. Crim. P. 41(g) (hereinafter "Rule 41(g)")[19] seeking return of the property seized.[20]

---

[18]*See supra* pp. 1089.

[19]Fed. R. Crim. P. 41(g) reads:

> Motion To Return Property. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

[20]On April 30, the government applied for a fifth search warrant in the Northern District of California, asking for authorization to "seize" all electronic data "regarding drug specimens, drug testing, specimen identification numbers, athlete identification numbers, and drug test results, retained by [CDT] . . . pertaining to the drug testing of Major League Baseball players, located within the copy of a CDT computer sub-directory currently in the possession of the [Internal Revenue Service ("IRS")] in San Jose, California, identified as the 'Tracey' sub-directory, bearing the following computer file group names: (1) 'MAJOR LEAGUE GROUP' (2) 'MLB BILLING' (3) 'MLB Drug SubCommittee' (4) 'MLB Follow UP' (5) 'MLB IOC.' " Because this copy of the Tracey directory was in the hands of the IRS in San Jose, in the Northern District of California, the government sought the search warrant in that district. *See* Fed. R. Crim. P. 41(g). Magistrate Judge Howard Lloyd approved the warrant. The government did not notify CDT, presumably because the IRS already had in

Meanwhile, the government continued to pursue its investigation. On May 5, using information culled from the Tracey directory, the government applied for new search warrants to seize all specimens and records relating to more than 100 non-Balco players who had tested positive for steroids. Magistrate Judge Leavitt in the District of Nevada authorized seizure of the specimens from Quest, and Magistrate Judge Rosalyn M. Chapman in the Central District of California authorized the seizure of records from CDT. Again, the government sought and obtained each warrant from the district court whose jurisdiction encompassed the situs of the property to be searched, as directed by Fed. R. Crim. P. 41(b).[21] The government executed the warrants on May 6, and the Players Association immediately filed motions under Rule 41(g), seeking return of the specimens and records seized.

---

its possession the copy of the entire directory containing the relevant materials.

The Players Association subsequently filed a Rule 41(g) motion in the Northern District of California seeking return of any property taken pursuant to the April 30 search warrant, and on August 9, 2004, Judge Illston granted this motion. The government did not appeal the order and does not dispute it now. Instead, the government asserts that it retains the right to review the Tracey directory based upon the April 7 search warrants, a contention we address in this consolidated appeal.

Insofar as the dissent suggests that the pursuit of the April 30 search warrant evidences bad faith harassment by the government and an attempt to evade a possibly adverse order on the motion for return of property filed in the Central District of California, we decline to speculate. We have no reason to believe that the government sought the April 30 warrant for purposes of harassment, rather than to avoid an additional search of CDT that would have followed from authorization to seize the original copy in the Central District. Since no district court has ever held an evidentiary hearing, and the government complied with the commands of the criminal rules to secure search warrants from the magistrate judges in whose districts the property was located, based upon a showing of probable cause that incriminating evidence would be found, we do not discern sufficient indicia of bad faith to support a contrary conclusion.

[21]*See supra* note 11.

On August 19, 2004, Judge Mahan ruled from the bench. He granted the Rule 41(g) motion brought by the Players Association in the District of Nevada and ordered the government to return all specimens seized from Quest and all notes and memoranda compiled by agents who reviewed the evidence, other than those pertaining to the ten Balco players named in the original search warrant.[22] He made findings—without conducting an evidentiary hearing—that "[t]he government callously disregarded the affected players' constitutional rights" and that the government unreasonably refused "to follow the procedures set forth in *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982)," with regard to the intermingled records seized in the Central District of California. Almost six weeks later, and again without conducting an evidentiary hearing, Judge Cooper rejected the government's suggestion that the documents were seizable under the warrant exception that applies to plain-view evidence of contraband,[23] and granted the Players Association's Rule 41(g) motion in the Central District of California. The order, which also cited the government's failure to follow *Tamura*'s procedures, mandated return to CDT of any evidence seized that was not connected to the ten players named in the warrant. Judge Cooper denied the government's motion for reconsideration of this order on February 9, 2005.

These orders are the subjects of two of the appeals consolidated here.[24]

---

[22]The government moved for a stay of this order because the evidence was otherwise lawfully in its possession pursuant to the subpoena of May 6, 2004. Judge Mahan denied the motion on November 1, 2004, based on the government's failure to raise the subpoena argument at the original hearing.

[23]We discuss the inapplicability of this warrant exception in Section III.A.4. *See infra* note 48.

[24]The government returned to CDT and Quest all items mandated for return under the two district court orders pending resolution of the appeals.

D

The third appeal concerns grand jury subpoenas issued to Quest and CDT on May 6, 2004, which were to be returned by June 10, 2004. These subpoenas reached all specimens and records of positive steroid drug tests for more than 100 MLB players and were not confined to records pertaining to the ten Balco players named in the earlier subpoenas.[25] The government also sought search warrants for this larger swath of evidence on the ground that the April 8 seizures did not provide all information needed for the investigation.[26]

Quest complied with the May 6 subpoena, providing the government with hundreds of pages of documents, but the government agreed to defer CDT's compliance pending resolution of the search warrant litigation. On August 31, 2004, however, the government revoked the indefinite deferral and instructed CDT to comply with the subpoena by September 14, 2004. The Players Association filed a motion to quash the subpoenas on September 13, 2004.

---

[25]These subpoenas were not the first ones issued in the investigation. The first subpoenas, dated January 16, 2004, mandated the provision of all MLB drug testing records. On March 3, 2004, the government obtained narrower subpoenas for eleven Balco-connected players.

On April 22, 2004, the government sent a letter to CDT withdrawing the January 2004 subpoenas. In the same letter, the government reduced the March 3, 2004, subpoenas to ten, not eleven, Balco players. At the time the government obtained the May 6 subpoenas, the only outstanding subpoenas were those of March 3, which sought the records of ten players with Balco connections.

[26]Recognizing that the documents they seized from CDT pursuant to the April 7 search warrant might not have included all documents relevant to the investigation (even with regard to Balco-related players, *see infra* note 46 and accompanying text), and deciding that the positive test results uncovered for MLB players beyond the ten with Balco connections could be valuable to the investigation, the government sought a broader warrant on May 6 in the Central District of California.

In December 2004, after hearing argument but without taking testimony, Judge Illston found that the government's conduct was unreasonable and constituted harassment. She filed an order quashing the subpoenas, which the government timely appealed.

II

Before we review the orders granting the Rule 41(g) motions in the Central District of California and the District of Nevada, we must decide two jurisdictional issues: whether the Players Association has standing to challenge the search and seizure of evidence from Quest and whether the government timely appealed Judge Cooper's order to return the materials seized from CDT in the Central District of California.[27]

A

The government contends that the Players Association lacks standing to file the Rule 41(g) motion, because it lacked access, control, and ownership over the records and specimens seized from Quest. Furthermore, it argues that the Players Association may not base its interest in the property (the urine specimens and test results) on the privacy interests of the individual players.[28]

---

[27]We need not decide whether the Players Association has standing to challenge the CDT seizures because CDT is a party and has standing on its own to seek return of the property seized from its office and storage locker.

[28]The Supreme Court has clearly rejected "vicarious" or "target" standing to assert Fourth Amendment rights. *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (refusing to extend standing to a party who was not a "victim" of the search); *see also United States v. Taketa*, 923 F.2d 665, 669-70 (9th Cir. 1991) (following *Rakas*, 439 U.S. at 134, and holding that a defendant did not have standing to challenge a search of another defendant's office). "A person who is aggrieved by an illegal search and seizure *only* through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth

**[1]** An association has standing to sue on behalf of its members when they would otherwise have independent standing to sue, the interests sought to be protected are germane to the organization's purpose, and the claim asserted does not require the participation of individual members in the lawsuit. *Pennell v. City of San Jose*, 485 U.S. 1, 7 n.3 (1988); *see also Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

**[2]** We are satisfied that the Players Association satisfies each prong of this test. First, the Players Association represents all MLB players, each one of whom could certainly sue in his own right to seek return of his own drug testing records. Second, the interests sought to be protected—the players' privacy interests in their drug testing records—are related to the organization's sole purpose: to represent the interests of MLB players. Third, the Players Association sought only the return of the players' drug testing information and specimens; for this type of prospective relief, the individual players need not be parties to the action. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975) (holding that an association lacked standing where it sought damages rather than "a declaration, injunction, or some other form of prospective relief").

**[3]** We therefore conclude that the Players Association has standing to assert the Fourth Amendment rights of its members sufficient to file Rule 41(g) motions seeking return of seized property in which their members hold privacy interests.

## B

**[4]** The Players Association and CDT contend that the government failed to appeal in a timely manner Judge Cooper's

---

Amendment rights infringed." *Rakas*, 439 U.S. at 134 (emphasis added). Because we are satisfied that the Players Association has met the requirements of associational standing, we do not reach its argument that it has an ownership interest in the seized items sufficient to establish standing in its own right. We leave that question for another day.

order for the return of property. In order to be timely when the United States, its officer, or its agency is a party, a notice of appeal must be filed "within 60 days after the judgment or order appealed from [was] entered." Fed. R. App. P. 4(a)(1)(B).

Judge Cooper's order granting the motion for a return of property was filed on October 1, 2004. On November 19, 2004, 17 days after receiving notice of the order, the government filed a "Motion for Reconsideration and Modification of Court's October 1, 2004 Order Granting Return of Property," asking the district court to modify the factual descriptions of the government's conduct. Judge Cooper reviewed this motion on the merits under Central District of California Local Rule 7-18 (governing "Motion[s] for Reconsideration").[29] Concluding that "the Government identifie[d] no material facts that the Court failed to consider," she denied the motion on February 9, 2005. On March 9, 2005, the government filed a notice of appeal, challenging both the original Rule 41(g) order and the denial of the motion for reconsideration.

[5] We have jurisdiction to review the denial of the motion for reconsideration, because the notice of appeal was filed within 60 days of that order. *See* Fed. R. App. P. 4(a)(1)(B). However, because the notice of appeal was filed more than five months after the order granting the Rule 41(g) motion,

---

[29]Central District of California Local Rule 7-18 reads:

A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

we can review that underlying order only if the motion for reconsideration tolled the 60-day period to file an appeal.

**[6]** Federal Rule of Appellate Procedure 4(a) sets forth specific rules for calculating the time to file an appeal, and permits tolling for certain motions for reconsideration made under the Federal Rules. *See* Fed. R. App. P. 4(a)(4)(iv), (vi). A motion for reconsideration may be eligible for tolling even if it was not filed or considered under the Federal Rules, as long as the motion *could have been* filed as a motion "to alter or amend the judgment under Rule 59" or a motion "for relief under Rule 60 if the motion is filed no later than 10 days after the judgment is entered." *See* Fed. R. App. P. 4(a)(4)(iv), (vi); *Shapiro v. Paradise Valley Unified Sch. Dist.*, 374 F.3d 857, 863 (9th Cir. 2004) (holding that tolling was appropriate under Fed. R. App. P. 4(a), because a motion for partial reconsideration that "[did] not state under which rule the motion was brought" could be construed under Rule 59(e)); *see also United States v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992) ("A motion, however labelled [sic], served within ten days of the entry of an order that could have been brought under Rule 59(e) tolls the time for filing a notice of appeal.").[30]

The Players Association and CDT argue that the government's motion cannot be treated as a motion for reconsideration for tolling purposes, because it was merely "*styled* as one for reconsideration," and only "asked the court to water down

---

[30]*Nutri-cology* stated that "motions made under Rule 60(b) do not toll the time for filing a notice of appeal," but that because the "government's motion for reconsideration . . . could have been brought under Fed. R. Civ. P. 59(e) . . . [it] toll[ed] the time for filing a notice of appeal." 982 F.2d at 397. That decision predated a 1998 amendment to Fed. R. App. P. 4(a), which inserted a provision allowing motions filed under Rule 60(b) to also toll the time to file an appeal, if such motions were filed within 10 days of the entry of judgment. *See* Fed. R. App. P. 4(a), advisory committee's note. The tolling analysis in *Nutri-cology* now applies to both Rule 59(e) and 60(b) motions. *See Shapiro*, 374 F.3d at 863.

its findings" without claiming that "the Court failed to evaluate the merits." We disagree. The government's motion asked Judge Cooper to "reconsider and modify several aspects of [her] order which inaccurately characterize[d] the government's actions," while expressly clarifying that it was "not asking for a substantive reconsideration of the Court's ultimate return order." The motion proposed several specific deletions of language in the opinion. These requests constitute a motion for reconsideration and may be treated under the Federal Rules governing such motions. *See Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp.*, 248 F.3d 892, 898-99 (9th Cir. 2001) ("[A] 'motion for reconsideration' is treated as a motion to alter or amend judgment under Federal Rule of Civil Procedure Rule 59(e) if it is filed within ten days of entry of judgment . . . . Otherwise, it is treated as a Rule 60(b) motion for relief from a judgment or order." (citing *Nutricology*, 982 F.2d at 397)).

**[7]** In this case, whether the motion could have been filed under Rule 59(e) or could have been filed under Rule 60(b) makes no difference. Either way, the government's motion fails to satisfy the time requirements for tolling under Fed. R. App. P. 4(a). To be eligible for tolling, the motion had to have been filed by October 11, 2005—ten days after the order granting the Rule 41(g) motion. *See* Fed. R. App. P. 4(a)(4). The motion was filed *forty-nine* days after the order, exceeding the time period by thirty-nine days.

The government seeks an alternative avenue to obtain tolling by arguing that it did not receive notice of the order until November 2, 2004, and therefore that the time limit should not be calculated from the date of the entry of judgment. We agree that delays in notice may offer a basis for filing after the normal deadline, but the Federal Rules expressly state that parties must request an extension of time to file an appeal in such circumstances. *See* Fed. R. App. P. 4(a)(6) (permitting a district court to reopen the time to file an appeal where a

party did not receive notice);[31] *see also* Fed. R. App. P. 4(a)(5) (allowing a district court to extend the time to file an appeal upon a showing of excusable neglect or good cause).[32]

The government never sought an extension of its time to file a notice of appeal. Instead, in a footnote to its motion for reconsideration, the government made the strange request for "leave to file this motion for reconsideration" at a point "outside of the normal time frame for the filing such motions." Yet the motion was timely under the local rule on motions for reconsideration, *see* C. D. Cal. Local Rule 7-18, as well as under the applicable federal rule, *see* Fed. R. Crim. P. 60(b). Neither the Players Association nor the district court responded to the government's odd request; they simply focused on the merits of the motion for reconsideration. Although we are not certain why the government requested special cognizance of the motion, we imagine that it may have feared that the district court otherwise would dismiss the motion as untimely under Rule 59(e). In any case, the government's request did not constitute a motion for an extension of time to file an *appeal*, because the narrow and precise request asked the court to review the motion for reconsideration without any mention of a future filing, and never invoked any local or federal rule allowing time to extend the time to file an appeal.[33]

---

[31]An extension under this rule may be granted upon a finding that the party did not receive notice of the order sought to be appealed, that the party filed "the motion" within 180 days after the judgment or order or within 7 days after receiving notice, whichever is earlier, and that no party would be prejudiced. Fed. R. App. P. 4(a)(6)(A)-(C).

[32]A party invoking this rule must move "no later than 30 days after the time prescribed by Rule 4(a) expires" and must show "excusable neglect or good cause." Fed. R. App. P. 4(a)(5)(A). An extension under this rule may not exceed "30 days after the prescribed time or 10 days after the date when the order granting the motion is entered." Fed. R. App. P. 4(a)(5)(C).

[33]Moreover, even if we were to calculate the time to file a motion for reconsideration or a notice of appeal from the date of notice—November 2, 2004—rather than the date of entry of judgment—October 1, 2004—the

The government seeks to evade the conclusion that its notice of appeal was too late by arguing that the Players Association waived the right to raise a timeliness objection by first raising such claim in its petition for rehearing. Basing its argument on the Supreme Court's decision in *Eberhart v. United States*, 546 U.S. 12 (2005), and on our decision in *United States v. Sadler*, 480 F.3d 932 (9th Cir. 2007), the government argues that the relevant tolling provisions of Fed. R. App. P. 4(a) are nonjurisdictional and that the Players Association forfeited any argument that they were not satisfied.

In *Eberhart*, the Supreme Court addressed the question of what time limitations are jurisdictional. Acknowledging that its prior decision in *United States v. Robinson*, 361 U.S. 220 (1960), "ha[d] created some confusion because of its observation that 'courts have uniformly held that the taking of an appeal within the prescribed time is mandatory and jurisdictional,' " the Court distinguished "nonjurisdictional claim-processing rules" from rules that "deprive federal courts of subject-matter jurisdiction." 546 U.S. at 16. The Court explained that only the former could be forfeited. *See id.* at 19 (holding that the "Court of Appeals should . . . have proceeded to the merits" of a Fed. R. Crim. P. 33 motion based

government's motion for reconsideration was filed seven days too late to toll the time to file a notice of appeal under Fed. R. App. P. 4(a). And if we were to read the government's request as a motion for an extension of time to file an appeal under Fed. R. App. P. 4(a)(6), and the court's February 9, 2005, order denying the motion for reconsideration as an implied grant of such motion for an extension, the government's notice of appeal still would have been untimely. The government filed its notice of appeal on March 9, 2005, but Fed. R. App. P. 4(a)(6) would have allowed an extension only until February 23, 2005 (14 days after the order). *See id.* Similarly, the notice of appeal would have been too late under Fed. R. App. P. 4(a)(5), which would have allowed an extension only until February 19, 2005 (10 days after the order). *See id.* at 4(a)(5)(C). Thus, even if the government had requested and received an extension of time under the federal rules, its notice of appeal was filed too late to allow us to review the underlying order granting the Rule 41(g) motion.

on a court-imposed rule, because "where the Government failed to raise a defense of untimeliness until after the District Court had reached the merits, it forfeited that defense").

**[8]** Whether a federal rule establishing a time limitation imposes a jurisdictional rule depends on whether the rule derives from a statute. *See Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) (holding that "statutory provisions . . . contain[-ing] built-in time constraints" create jurisdictional limits but that jurisdiction is not affected by "Court prescribed 'rules of practice and procedure' " (citation omitted)); *Sadler*, 480 F.3d at 937 ("Rules provisions governing timeliness that do not implement congressionally mandated 'built-in time constraints' are therefore properly considered nonjurisdictional limitations, subject to forfeiture." (quoting *Kontrick*, 540 U.S. at 453).

In *Sadler*, we applied this distinction to Fed. R. App. P. 4. We concluded that "the timeliness dictates of Rule 4(b) are forfeitable, because Rule 4(b) is a nonjurisdictional claim-processing rule." 480 F.3d at 940 (emphasis omitted). We contrasted the mandates of Fed. R. App. P. 4(a): "Congress has specifically limited our jurisdiction to hear civil appeals at 28 U.S.C. § 2107(a), which codifies the same time constraints on the filing of civil appeals (but *only* civil appeals) that exist in Rule 4(a)." *Id.* at 937 (footnote omitted).

**[9]** The government seeks to benefit from the distinction between jurisdictional and forfeitable claims under Fed. R. App. P. 4 by arguing that the Rule 41(g) motion should be treated under the criminal rule, Fed. R. App. P. 4(b), because the motion sought a return of property used in a criminal investigation.[34] But our governing caselaw makes clear that a Rule

---

[34]Undoubtedly, the notice of appeal would have been untimely under the criminal rule absent forfeiture of that claim, for that rule gives the government only 30 days to file an appeal and has no provision for tolling during pendency of motions for reconsideration such as the one at bar. *See* Fed. R. App. P. 4(b).

41(g) motion is "treated as [a] civil equitable proceeding[ ]." *Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir. 1993). The proper rule for considering civil appeals from the disposition of a Rule 41(g) motion is thus Fed. R. App. P. 4(a).

Our *dicta* in *Sadler* states that the timing requirements of Fed. R. App. P. 4(a) are jurisdictional and that claims under that rule are not forfeited. *See* 480 F.3d at 937. The Supreme Court recently addressed this issue. In *Bowles v. Russell*, 127 S.Ct. 2360 (2007), the Court ruled that Fed. R. App. P. 4(a)(6), which allows a court to grant a 14-day extension to file an appeal, established a jurisdictional requirement. *Id.* at 2366. Explaining that "Congress specifically limited the amount of time by which district courts can extend the notice-of-appeal period in § 2107(c), that limitation is more than a simple 'claim-processing rule' " and therefore the petitioner could not rely on it "to excuse his lack of compliance with the statute's time limitations." *Id.*

**[10]** *Bowles* does not specifically discuss Fed. R. App. P. 4(a)(4), the tolling provision relevant here. The government argues that "Rule 4(a) does not incorporate a statutory time limit in its provision of tolling for Rule 59(e) or Rule 60 motions" and therefore that any failure to comply with the rule should be immunized against belated attack. However, although Fed. R. App. P. 4(a)(4) does not contain language from 28 U.S.C. § 2107, which lacks a tolling provision, the Supreme Court's decision in *Bowles* suggests that the same characterization applies: "Today we make clear that the timely filing of a notice of appeal in a civil case is a jurisdictional requirement." *Id.*

**[11]** And even if *Bowles* did not settle the matter with respect to Fed. R. App. P. 4(a)(4),[35] we could not consider the

---

[35]An argument can be made on this score, as the advisory committee's note to Fed. R. App. P. 4(a)(4) reveals that this provision was created by the Court and amended in light of developing caselaw. While the advisory

underlying order granting the Rule 41(g) motion. In order to accept the government's argument, we would have to grant the jurisdictional benefit of tolling while denying the tolling rule's jurisdictional significance. We cannot defeat logic or text in this manner. If Fed. R. App. P. 4(a)(4) is jurisdictional, the government's motion does not qualify for tolling because it was filed outside the time frame specified in that rule. *See* Fed. R. App. P. 4(a)(4)(iv), (vi) (permitting tolling for such motions only if they are filed within 10 days of entry of judgment).[36] If Fed. R. App. P. 4(a)(4) is *non*jurisdictional, satisfaction of that provision (or forfeiture of a claim that the government failed to satisfy it) would not enable us to ignore the jurisdictional 60-day rule of Fed. R. App. P. 4(a)(1).[37] *See*

---

committee's note links Fed. R. App. P. 4(a)(1) to 28 U.S.C. § 2107, the note contains no statutory link for Fed. R. App. P. 4(a)(4). And although the notes state that compliance with the rule "places jurisdiction in the courts of appeals," that use of the word "jurisdiction" is the kind of imprecise terminology clarified in *Kontrick* that distinguishes between statutory and court-based rules. *See* 540 U.S. at 454 ("Courts, including this Court, it is true, have been less than meticulous in this regard; they have more than occasionally used the term 'jurisdictional' to describe emphatic time prescriptions in rules of court. 'Jurisdiction,' the Court has aptly observed, 'is a word of many, too many, meanings.' " (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998) ).

[36]The district court's order denying the motion for reconsideration on the merits did not constitute an implicit grant of an extension of time to file within the tolling period, and even if it did, such an extension would carry no weight: even the Supreme Court has "no authority to create equitable exceptions to jurisdictional requirements." *Bowles*, 127 S. Ct. at 2366.

[37]Fed. R. App. P. 4(a)(4) does not provide *exceptions* to tolling. Instead, the rule *permits* tolling based on a limited set of motions—including motions for reconsideration filed within 10 days of entry of judgment. If that provision were nonjurisdictional, the Players Association and CDT could not raise its 10-day limitation as a bar to tolling under it. But neither could the government invoke it as a reason to alter the 60-day time limit provided by Fed. R. App. P. 4(a)(1). No other provision of the Federal Rule would permit tolling for a motion for reconsideration, rendering the government's argument ineffective.

*Bowles*, Slip Op. at 8. Under either interpretation of Fed. R. App. P. 4(a)(4), the government's notice of appeal was untimely as to Judge Cooper's underlying order granting the Rule 41(g) motion and must be dismissed for lack of jurisdiction.[38]

## III

Having thus disposed of the two preliminary matters of standing and jurisdiction, we turn to the merits of Judge Cooper's order denying the motion for reconsideration in the Central District of California. We review such orders for an abuse of discretion. *Smith v. Pac. Prop. & Dev. Corp.*, 358 F.3d 1097, 1100 (9th Cir. 2004) ("We review the denial of a motion for reconsideration for abuse of discretion." (citation omitted)); *see also United States v. Washington*, 98 F.3d 1159, 1163 (9th Cir. 1996) ("This court reviews a district court's denial of a Rule 60(b) motion for an abuse of discretion."). If a district court premises such denial upon a legal determination, the legal issue must be reviewed *de novo.* *Smith*, 358 F.3d at 1100 (citations omitted) ("Whether such a denial rests on an inaccurate view of the law and is therefore an abuse of discretion requires us to review the underlying legal determination *de novo.*"); *see also Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam) ("The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law.").

The government confined its motion for reconsideration in this case to factual matters: "While the government respectfully disagrees with the Court's conclusion that movants are entitled to a return of property as a matter of law, the govern-

---

[38]Because the notice of appeal was timely only as to her denial of the government's motion for reconsideration, we limit our review to that order in Part III.

ment emphasizes that it does *not* herein request reconsideration of the Court's core order requiring the return of the items seized . . . ." Instead, the motion asked the court only to "reconsider and modify several aspects of this order which inaccurately characterize the government's conduct in this case." The motion argued that the district court had failed to consider aspects of the record that would have belied its finding that the government's behavior was "egregious," that the investigating agents failed to comply with the search warrant, that the agents lacked a lawful right to seize the intermingled documents, and that the government " 'blatant[ly] misrepresent[ed]' . . . the danger of destruction of records." The government offered evidence for the district court to consider and requested deletions of findings of misconduct from the order.

Judge Cooper rejected these proposed modifications. She assured the government that she "did not fail to consider the explicit language of the warrant." She characterized her conclusion that "the agent[s] did not have a lawful right of access to the computer records" as a legal determination based on *Tamura*, 694 F.2d 591, not a factual one—thereby placing it outside the scope of the government's motion, which by its terms was confined to matters of fact. Confirming that she had taken into account the "lengthy history of stalling and delay by [the Players Association and CDT] in connection with the grand jury subpoenas served prior to the government's execution of the search warrant," Judge Cooper nevertheless reiterated her view that the "simultaneous use of warrants and subpoenas was inappropriate given all the circumstances." Finding "no other material facts the Court allegedly failed to consider," she stated that "mere disagreement with the Court's interpretation of the evidence and its opinions about what does and does not constitute acceptable conduct . . . does not justify reconsideration" and denied the motion.

[12] The question then becomes: what issues fall within the scope of our appellate review? We recognize that "[a] district

court may abuse its discretion if it does not apply the correct law," *Washington*, 98 F.3d at 1163, and that the district court's analysis and application of *Tamura* in its original order may well have been in error. *See infra* Section IV.B. However, Judge Cooper's denial of the *motion for reconsideration* did not "rest[ ] on an inaccurate view of the law." *Washington*, 98 F.3d at 1163. Although Judge Cooper referenced *Tamura* and the legal conclusions in her underlying order, she did not premise her denial of the government's motion for reconsideration upon them. She stated clearly that her denial was based upon her review of the record and the factual arguments presented in the motion. While we might not have reached the same findings of fact, "[o]ur review is limited and deferential." *Sw. Voter Registration Educ. Project*, 344 F.3d at 918. We are satisfied that Judge Cooper duly assessed all relevant facts cited in the motion. We cannot discern in her refusal to change the language of the order an abuse of discretion and thus must affirm the denial of the government's motion for reconsideration.[39]

## IV

We turn next to Judge Mahan's order granting the Players Association's Rule 41(g) motion to return property seized from Quest in the District of Nevada.

---

[39]It would be inappropriate for us to use the government's fact-based motion for reconsideration as a vehicle to reconsider interpretations of law that were dispositive only to the underlying order granting the Rule 41(g) motion, even if we believed that errors of law occurred. We have no jurisdiction over the order granting the return of property, and decline to discuss the treatment of *Tamura* therein.

It is possible that the legal analysis in the order granting Rule 41(g) motion may conflict with our authoritative interpretation of *Tamura*, as explained in Section IV of this opinion with regard to the appeal from the District of Nevada. But we are powerless to reconcile any such discrepancies, for the government's notice of appeal grants us jurisdiction only to review the denial of the motion for reconsideration.

A

**[13]** Before considering the merits of that order, we must first satisfy ourselves that the district court had the necessary equitable jurisdiction to consider the motion.[40] A district court may exercise equitable jurisdiction to hear such a motion only after analyzing the four factors set out in *Ramsden*, 2 F.3d 322. Specifically, the court must consider

> 1) whether the Government displayed a callous disregard for the constitutional rights of the movant; 2) whether the movant has an individual interest in and need for the property he wants returned; 3) whether the movant would be irreparably injured by denying return of the property; and 4) whether the movant has an adequate remedy at law for the redress of his grievance.

*Id.* at 325. Without explication, Judge Mahan stated in his order that each of the four factors weighed in favor of equitable jurisdiction. Because the government now concedes that the parties have no adequate remedy at law, we only need to discuss the first three *Ramsden* factors.

1

In its memorandum supporting the Rule 41(g) motion in the District of Nevada, the Players Association argued that the seizure of urine specimens and test results constituted "callous disregard" of the MLB players' privacy interests:

---

[40]We review a district court's decision to exercise equitable jurisdiction under Fed. R. Crim. P. 41(g) for abuse of discretion. *Ramsden*, 2 F.3d at 324. We review the district court's interpretation of Fed. R. Crim. P. 41(g) *de novo*. *Id.* The lawfulness of a search and seizure is also reviewed *de novo*. *United States v. Mendoza-Ortiz*, 262 F.3d 882, 885 (9th Cir. 2001) (per curiam).

> Given the highly sensitive and confidential nature of drug testing samples and records and the information contained therein, and given the exacting measures undertaken by the parties to the [testing agreement] to prevent any disclosure of the players' test results to anyone, including MLB, the MLBPA, and the players themselves, any seizure of these materials, absent extraordinary justification, constitutes a "callous disregard" for the players' privacy interests.

Were we to accept this reasoning, any seizure of confidential records would reveal callous disregard for privacy rights, even if such seizure were expressly authorized by a lawful search warrant.

The government's conduct in the District of Nevada does not support a finding of callous disregard. After showing probable cause, the government obtained approval from Magistrate Judge Leavitt to search and to seize the urine samples and drug testing records held at Quest. Although the Players Association contends that the government had no legal right to use the intermingled files taken from CDT to support its May search warrant affidavits, there is an insufficient showing of callous disregard in the government's use of that evidence to obtain a warrant, in light of its view that the information was authorized for seizure under Magistrate Judge Johnson's search warrant protocol.[41]

Furthermore, contrary to the assertion of the Players Association, the government agents did not offer "misleading representations" to obtain the search warrant, and the

---

[41]Because *Ramsden* requires an assessment of jurisdiction over a Rule 41(g) motion prior to determining the merits of the motion, we reserve our discussion of the objective legality of the use of the intermingled evidence seized from CDT for our review of the merits of the order granting the motion. *See infra* Section IV.B. As that discussion reveals, our conclusion with regard to the law accords with our view of jurisdiction.

government did not hide the controversy surrounding the sub-poena that had been issued for the same property. The affida-vit for the search warrant in the District of Nevada advised Magistrate Judge Leavitt that CDT and Quest "intend[ed] to move to quash the subpoena." Later, that language was crossed out and replaced with a handwritten note: "A motion to quash has been filed. 4.7.04," followed by Magistrate Judge Leavitt's initials. The record makes clear that Magis-trate Judge Leavitt was duly advised of the subpoenas and their status in court. The government's affidavits do not reveal callous disregard for the players' privacy interests in the urine samples and other testing evidence held in the District of Nevada. No doubt these samples and test results implicated sensitive privacy interests, but the government was not there-fore compelled to stymie its enforcement of the law by declin-ing to pursue search warrants at all, especially since warrants are designed to protect Fourth Amendment privacy interests.

Not only did the government establish probable cause, but the agents executed the search warrant with due respect for the interests of the MLB players and Quest, the third party searched. The government seized items clearly delineated by the warrant and accepted the assistance of Quest personnel to avoid taking unrelated items, thus displaying attentiveness both to the warrant's scope and avoiding unnecessary interfer-ence with Quest's business operations. Quest cooperated in the search and declined to join the Players Association's sub-sequent Rule 41(g) motion. We conclude that the first prong of the *Ramsden* analysis weighs against invocation of the dis-trict court's equitable jurisdiction over the Rule 41(g) motions.

2

As to the second of the four *Ramsden* factors (the movants' individual interests in the evidence seized), the Players Asso-ciation argues that its interests in the property mirror those of its members. We agree that its members possess strong pri-

vacy interests in both their drug test results and the actual specimens. *See Roe v. Sherry*, 91 F.3d 1270, 1274 (9th Cir. 1996) (recognizing an individual's "strong interest in protecting the confidentiality of [one's] HIV status"). Because the Players Association exists to represent such interests, Judge Mahan properly found that this factor weighed in favor of equitable jurisdiction.

### 3

Judge Mahan also found satisfied the third *Ramsden* factor (likelihood of irreparable injury if the evidence were not returned). As the Players Association notes, the public release of positive drug testing evidence could irreparably damage the careers of the affected players, even if the positive results were not actually caused by illegal steroid use. Based on this danger, we agree that the third factor also weighs in favor of equitable jurisdiction.

### 4

[14] Although we conclude that the district court erred in finding callous disregard of Fourth Amendment rights, the three other equitable jurisdiction factors weigh in favor of hearing the motions by the Players Association. *See Ramsden*, 2 F.3d at 326 (holding that where three of the four factors favored an exercise of equitable jurisdiction, the court had power to hear a Rule 41(g) motion). As such, we cannot say that Judge Mahan's initial choice to hear the motion constituted an abuse of discretion.

### B

We turn now to the merits of Judge Mahan's substantive ruling requiring the return of property seized in the District of Nevada that did not relate solely to the ten players named in the April 7 search warrants.

1

**[15]** With respect to property taken during the execution of search warrants, Rule 41(g) provides that a person "aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." When such a motion is granted, the property in question must be returned to the moving party, but a court "may impose reasonable conditions to protect access to the property and its use in later proceedings." *Id.* Although the rule itself does not set a standard for determining when property should be returned to a moving party, an advisory committee's note explains that "reasonableness under all of the circumstances must be the test." Fed. R. Crim. P. 41(g), advisory committee's note.[42]

The Players Association argues that the seizure of property from Quest in the District of Nevada was unreasonable. The Players Association offers no argument that the search of Quest exceeded the terms of the search warrant or was executed in an unconstitutional manner. Instead, the Players Association argues that the search warrant lacked a legal foundation because the government's affidavits used intermingled files seized at CDT to name individuals other than the ten players previously identified. The Players Association contends that these files were illegally seized and that "the government . . . [is forbidden] from disseminating or using the fruits of an illegal search." Under the doctrine of the "fruit of the poisonous tree," evidence may not be used if " 'granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (citation omitted).

---

[42]The Supreme Court previously has cited an advisory committee's note to illuminate the meaning of a federal rule. *See Huddleson v. United States*, 485 U.S. 681, 688 (1988) (interpreting Fed. R. Evid. 404(b)); *United States v. Owens*, 484 U.S. 554, 555 (1988).

The district court agreed with this fruit-of-the-poisonous-tree reasoning, expressly premising its order to return property seized in the District of Nevada on the illegality of the seizures in the Central District of California:

> Under the particular circumstances of this case, it was unreasonable for the Government to refuse to follow the procedures set forth in *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), upon learning that drug-testing records for the ten athletes named in the original April 8 warrants executed at Quest and at Comprehensive Drug Testing, Inc. ("CDT") were intermingled with records for other athletes not named in those warrants.

2

[16] We review the district court's legal analysis *de novo*. *Mendoza-Ortiz*, 262 F.3d at 885. Like Judge Mahan, we look to the seizure of intermingled data in the Central District of California in order to determine whether that information provided a valid foundation for the warrants in the District of Nevada.[43] *See United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001) ("Once the district court determined that the search warrant included illegally obtained information, it properly purged the affidavit of the offending facts and examined whether the remaining facts still afforded a substantial basis

---

[43]Although the search and seizures at CDT occurred in a different district, Judge Mahan properly considered them, because they played a necessary and dispositive role in the authorization of the seizures at Quest. Judge Mahan evaluated the legality of those seizures before Judge Cooper ruled on them in the Central District of California, and did not premise his decision on the view that he was bound by a previous decision. If anything, the litigation in the Central District suggested the opposite: Magistrate Judge Johnson had recommended that the Rule 41(g) motion filed by the Players Association and CDT should be denied. Only later did Judge Cooper reject that recommendation and grant the Rule 41(g) motion, ordering the property to be returned to CDT.

for concluding that the search warrant was supported by probable cause.").

This court has addressed previously whether the government may seize units containing information authorized for seizure intermingled with information not described in the search warrant. In *United States v. Beusch*, 596 F.2d 871 (9th Cir. 1979), we dealt with a motion to suppress evidence consisting of hard-copy ledgers containing items covered by the search warrant intermingled with items not covered by the search warrant. *Id.* at 876-77. We concluded that no Fourth Amendment violation occurred when agents seized "single files and single ledgers, i.e., single items which, though theoretically separable, in fact constitute one volume or file folder." *Id.* at 877. We constrained our ruling by stating that "the reasons we have given for allowing [such] seizure may not apply to *sets* of ledgers or files, but because that is not the case here, we find it unnecessary to discuss it further." *Id.* (emphasis added).

**[17]** Three years later, in *Tamura*, 694 F.2d 591, we considered whether the government could seize a *set* of hard-copy files including target data as well as information not specified in the search warrant. In that case, officers executed a search warrant for three specified categories of records stored at a Los Angeles office. *Id.* at 594. Agents seized—without any limiting effort—files that were not specified in the search warrant. *Id.* at 595. We condemned such "wholesale seizure for later detailed examination of records not described in a warrant." *Id.* (emphasis omitted). Holding that the Fourth Amendment barred the conversion of a specific warrant into a general one, we described two methods by which the government could avoid such constitutional violations.

First, if the government anticipated that on-site segregation of target documents would not be feasible in a reasonable amount of time, it can seek a preordained warrant protocol allowing the seizure of such intermingled documents. This

approach would ensure proper judicial oversight of any sei-zures.

> If the need for transporting the documents is known to the officers prior to the search, they may apply for specific authorization for large-scale removal of material, which should be granted by the magistrate issuing the warrant only where on-site sorting is infeasible and no other practical alternative exists. *See United States v. Hillyard*, 677 F.2d 1336, 1340 (9th Cir. 1982). The essential safeguard required is that wholesale removal must be monitored by the judgment of a neutral, detached magistrate.

*Tamura*, 694 F.2d at 596. Specific authorization to make such seizures depends on detailed information in the government's search warrant affidavits, which should describe "the relevant technological issues," *Managing Discovery, supra* note 13, at 21, and the feasibility of parsing the anticipated storage media. With such information, a magistrate can set forth guidelines that ensure the government does not seize inter-mingled data without judicial oversight. If a warrant includes such protocol, and the government abides by it, post-search review is not necessary.[44]

Second, if the government obtained a search warrant with-out a preordained protocol for removing intermingled target and non-target data, but encountered an *unanticipated* need to seize units containing intermingled data, agents could seize that unit and seal it pending post-search review. Only if authorized by the "judgment of a neutral, detached magis-trate" could it keep the seized items. Like the use of a pre-search protocol, this second method of post-search authoriza-tion would ensure judicial oversight in cases where on-site segregation of intermingled data cannot feasibly occur.

---

[44]In other words, a Fourth Amendment violation could still occur if the government did not comply with the warrant protocol, or if the warrant was issued without probable cause.

**[18]** In the comparatively rare instances where documents are so intermingled that they cannot feasibly be sorted on site, we suggest that the Government and law enforcement officials generally can avoid violating fourth amendment rights by sealing and holding the documents pending approval by a magistrate of a further search, in accordance with the procedures set forth in the American Law Institute's Model Code of Pre-Arraignment Procedure.[45]

---

[45]The *Tamura* court pointed to the American Law Institute's Model Code of Pre-Arraignment Procedure as a guide that would help agents avoid constitutional violations in situations where intermingled documents needed to be seized but where the search warrant lacked a protocol for such seizures. 694 F.2d at 595-96. The *Tamura* court found that the agents had violated Fourth Amendment rights by making a "wholesale seizure," rendering the post-search alternative approach to be advisory *dicta*. *See id.* at 595; *see also United States v. Hill*, 322 F. Supp. 2d 1081, 1090 (C.D. Cal. 2004) (noting that after the *Tamura* court "held that the government's wholesale seizure of company documents was illegal because the agents intentionally seized materials they knew were not covered by the warrant . . . the *Tamura* court suggested, *albeit in dicta*, that [for such seizure of all records] a warrant would be appropriate" (emphasis added)).

It is true that *Tamura*'s two methods of a pre-search protocol or post-search review were advised in *dicta* and represented pragmatic approaches rather than constitutional rules. We recognize that some courts in other circuits have questioned the procedures advised in *Tamura*. One district court in Michigan explained: "The Court declines to follow *Tamura*, at least in this case, because *Tamura* did not involve computer files and therefore did not consider the specific problems associated with conducting a search for computerized records." *United States v. Scott-Emuakpor*, 2000 WL 288443, at *8 (W.D. Mich.). Although declining to apply *Tamura*'s pragmatic approach to computer searches, Judge Quist stated: "This is not to suggest that seizure of all computer disks is permissible whenever the warrant authorizes the seizure of computer records." *Id.* Another court, also referencing *Tamura*, noted that in the modern computer context a " 'suggestion' by a panel of the Ninth Circuit in a 20-plus year old case is not persuasive." *United States v. Kaufman*, 2005 WL 2304345, at *4 n.3 (D. Kan).

Like these district courts from other circuits, we recognize that the computer era adds new complexity to the test of reasonableness under the Fourth Amendment. Precisely for this reason, we view *Tamura* as especially significant in the computer context.

*Tamura*, 694 F.2d at 595-96 (footnote omitted).

Recently, we applied *Tamura* to uphold seizures of intermingled documents in the computer context. In *United States v. Adjani*, 452 F.3d 1140 (9th Cir. 2006), investigating agents obtained a search warrant to seize evidence of the defendant Adjani's extortion activities. *Id.* at 1142. The search warrant contained a detailed protocol for the seizure of intermingled evidence. *Id.* at 1149 ("The Adjani warrant 'describe[d] in great[ ] detail the items one commonly expects to find on premises used for the criminal activities in question . . . .' " (alterations in original)). In executing the warrant, agents seized Adjani's computer as well as the computer of a woman living with him, who was not identified as a suspect in the warrant. *Id.* The computers were subsequently searched at an FBI computer lab, and evidence they contained was used to charge both Adjani and his housemate. In a motion to suppress the evidence, the two defendants argued that the woman's computer was not seizable under the search warrant, and if it were, that the search warrant was overbroad. We rejected both claims, citing the difficulty of segregating electronic data:

> We understand the heightened specificity concerns in the computer context, given the vast amount of data they can store. As the defendants urge, the warrant arguably might have provided for a "less invasive search . . . ." Avoiding that kind of specificity and limitation was not unreasonable under the circumstances here, however. To require such a pinpointed computer search, restricting the search to an email program or to specific search terms, would likely have failed to cast a sufficiently wide net to capture the evidence sought. *Cf.* [*United States v.*] *Ross*, 456 U.S. [798,] 821 [1982] ("When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the

> case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.").

*Id.* at 1149-50 (parallel citation omitted). Reiterating what we set forth in *Tamura*, we approvingly noted that the warrant incorporated a specific protocol:

> The supporting affidavit attached to the warrant set forth a detailed computer search protocol, including instructions as to when the computers should be searched on-site rather than taken off-site and procedures for screening the data to determine what data could be searched and seized under the terms of the warrant. *See also* U.S. Dep't of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 43, 69 (July 2002) (detailing what FBI agents should include in warrants when they contemplate the need to search computers). Such specificity increases our confidence that the magistrate judge was well aware of what he was authorizing and that the agents knew the bounds of their authority in executing the search. *Cf.* [*United States v.*] *Hay*, 231 F.3d [630,] 636 [(9th Cir. 2000)] (considering favorably an affidavit providing "that searches and seizures of evidence from computers requires agents to seize all parts of a computer system to be processed later by a qualified computer expert.").

*Id.* at 1149 n.7. "The contours of [the Fourth Amendment's] protections in the context of computer searches pose difficult questions," we explained. *Id.* at 1152. "Computers are simultaneously file cabinets (with millions of files) and locked desk drawers; they can be repositories of innocent and deeply personal information, but also of evidence of crimes. . . . As soci-

ety grows ever more reliant on computers . . . courts will be called upon to analyze novel legal issues and develop new rules within our well established Fourth Amendment jurisprudence." *Id*. Attuned to the needs of law enforcement as well as privacy, we upheld the validity of the search warrant and rejected the argument that items of evidence fell "outside the scope of the warrant because they implicated [a person not named in the warrant] in the crime and supported a charge of conspiracy to commit extortion [against her]." *Id.* at 1151.

In 2006, we confirmed the validity of this analysis in *United States v. Hill*, 459 F.3d 966 (9th Cir.), where we addressed a motion to suppress evidence. The defendant argued that the warrant was overbroad because it allowed the seizure of computer and storage media related to child pornography without requiring the government to conduct an on-site search and without providing a protocol. *Id.* at 973-78. Citing *Tamura* and *Adjani*, we explained that on-site review was not always required. *Id.* at 975-76. We emphasized the "serious risk that the police might damage the storage medium or compromise the integrity of the evidence by attempting to access the data at the scene" and the disruption caused by attempts to segregate complex electronic data on-site:

> [T]he process of searching the files at the scene can take a long time. To be certain that the medium in question does not contain any seizable material, the officers would have to examine every one of what may be thousands of files on a disk—a process that could take many hours and perhaps days. Taking that much time to conduct the search would not only impose a significant and unjustified burden on police resources, it would also make the search more intrusive. . . . If the search took hours or days, the intrusion would continue for that entire period, compromising the Fourth Amendment value of mak-

ing police searches as brief and non-intrusive as possible.

*Id.* at 974-75. In light of these concerns, we concluded that it was "reasonable under the Fourth Amendment for the police to take all of [the defendant's] computer storage media from his home (they did not find his computer) so they could conduct their search offsite in a police laboratory, rather than carrying out the search onsite and taking only whatever evidence of [targeted material] they might find." *Id.* at 968. "[T]he warrant was not fatally defective in failing to require an onsite search and isolation of child pornography before removing storage media wholesale." *Id.* at 975.

**[19]** We then addressed whether the warrant was invalid because it lacked a specific protocol for seizures of electronic data. Although we made clear that a specific protocol was not mandatory, we stated that a "warrant[ ] authorizing blanket removal of all computer storage media for later examination," must be premised upon an "affidavit giving a reasonable explanation . . . why a wholesale seizure is necessary." *Id.* at 976 (citing *Tamura*, 694 F.2d at 595). "A warrant describing a category of items is not invalid if a more specific description is impossible," *id.* at 973, as long as the affidavit explains why "the officers could *not* reasonably describe the objects of their search with more specificity," *id.* at 976.

The agents in *Hill* offered neither a detailed description of the items to be seized nor any explanation of why a specific description was impossible. "Accordingly, we h[e]ld that the warrant here was overbroad in authorizing a blanket seizure in the absence of an explanatory supporting affidavit, which would have documented the informed endorsement of the neutral magistrate." *Id.* at 976-77 (citing *Tamura*, 694 F.2d 596). At the same time, we held that "the search here was supported by probable cause and, notwithstanding the shortcomings of the search warrant affidavit, the manner of its

execution *d[id] not mandate suppression of the fruits of that search*." *Id.* at 979 (emphasis added).

### 3

[20] We now apply these precedents to determine whether the seizures at CDT were unlawful. The problems of intrusiveness that we recognized in *Hill* are all the more apparent here because the search was conducted on the premises of a third party business. In this case, the government obtained advance authorization to seize intermingled documents based upon a search warrant protocol that had been carefully outlined and supported. The government's affidavits were premised on the advice of computer specialists, who anticipated that certain intermingled evidence might be difficult to separate on-site:

> Upon searching the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.
> . . .
>
> If the computer personnel determine that it is not practical to perform an on-site search or make an on-site copy of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.

As we explained in *Hill*, the affidavits did not require prescience but they must contain a candid recitation of the available information.

> Without such individualized justification being presented to the magistrate, we cannot be sure that the

> judge was aware of the officers' intent and the technological limitations meriting the indiscriminate seizure—and thus was intelligently able to exercise the court's oversight function. An explanatory statement in the affidavit also assures us that the officers could not reasonably describe the objects of their search with more specificity.

459 F.3d at 976. In this case, unlike in *Hill*, the government submitted detailed affidavits describing the anticipated difficulties of sorting computer data on-site. The affidavits proposed a protocol to guide and to limit the seizures of intermingled evidence, which Magistrate Judge Johnson approved.

Furthermore, the record reveals that the government complied with the protocol in the warrant. Agent Abboud, a computer analyst, determined that on-site review would not be feasible in a reasonable amount of time. The agents then copied several intermingled documents, including the Tracey directory. They did not seize the actual computer, although the search warrant authorized full seizure of the hardware if computer analysts determined that neither on-site searching nor copying were feasible. The government thereby enabled CDT to continue its business operations.

Although the Players Association contends that the government behaved unreasonably by copying the entire Tracey directory, an analysis of the difficulty of segregating intermingled electronic data reveals the opposite. The Federal Judicial Center recently explained:

> [S]ome computer-based transactions do not result in a conventional document, but instead are represented in integrated databases. Even less-complex ESI [electronically stored information] may be incomprehensible and unusable when separated from the system that created it. For example, a spreadsheet

produced in portable document format (PDF) may be useless because embedded information, such as computational formulas, cannot be seen or discerned. Finally, deleting an electronic document does not get rid of it, as shredding a paper document would. An electronic document may be recovered from the hard drive, to the extent it has not been overwritten . . . .

These differences between ESI and conventional information have implications for discovery. For example, the dynamic nature of ESI makes it vital that a data producer institute "litigation holds" to preserve information that may be discoverable, often even before the lawsuit is filed. Moreover, the volume and multiple sources of ESI may lead to disputes about the scope of discovery and may make review to identify and segregate privileged information more difficult . . . .

*Managing Discovery*, *supra* note 13, at 3-4.[46] At the risk of losing data, the government ensured that CDT could continue its business activities, thus evidencing the reasonableness and restraint conspicuously absent in the "wholesale seizure" conducted by the agents in *Tamura*.[47]

---

[46]Agent Novitsky expressed the government's awareness of these risks in his May search warrant affidavits: "IRS Special Agent Jeff Jack, a Computer Investigative Specialist with the IRS, . . . gave me specific examples of deleted files or temporary files created when printing a file that cannot be[ ] seen or retrieved from a simple copy of a computer subdirectory, but may be retrievable using forensic tools, if allowed to examine the entire computer system."

[47]Increasingly, courts have recognized the danger of losing electronic information or obtaining only incomplete data. *See Adjani,* 452 F.3d 1140; *Hill,* 459 F.3d 966; *see also Scott-Emuakpor*, 2000 WL 288443, at *8 ("[T]he agents were not confined to searching the files on the hard drive and disks but could also lawfully search for deleted material . . . [;] the seizure of [items other than hard drives and disks] was reasonable because it allowed the agents to preserve the computer system as it existed for the computer analysts . . . without taking the risk of losing any files.").

Although the seizure of intermingled evidence was permitted under the warrant protocol, the Players Association argues that the government violated the search warrant's protocol by allowing Agent Novitzky to open and to view the contents of the Tracey directory, rather than leaving Agent Abboud to search alone. Under this view, *only* Agent Abboud was permitted to open and to view CDT computer data on-site. However, the plain language of the search warrant did not *exclude* the assistance of other law enforcement officers—especially for tasks involving non-digital work (such as seeking cooperation from persons on site). The warrant only required that computer personnel be the ones to determine whether on-site segregation of target data is feasible. The sort of assistance provided by Agent Novitzky, a non-specialized law enforcement officer under the guidance of Agent Abboud, was permissible under the search warrant and reasonable under the Fourth Amendment.

The dissent criticizes the government's decision to "copy the entire directory," pursuant to Agent Abboud's recommendation, rather than to "copy[ ] only the subdirectories that pertained to Major League Baseball" and suggests that the government should have trusted CDT to point out the relevant files. Dissent at 1143. The dissent explains that this approach would have allowed the government to select the relevant files on-site: "Dr. Jean Joseph of CDT later stated in an affidavit that the directory was easily searched by key word and would have provided the test information about the ten players in a short period of time." *Id*.

**[21]** We disagree. "The government should not be required to trust the suspect's self-labeling when executing a warrant." *Adjani*, 452 F.3d at 1150. Agents had no duty to rely on CDT personnel to point out the files seizable under the warrant. Like most searched parties, CDT had an incentive to avoid giving over documents of which the government might be unaware and to read the search warrant as narrowly as possible. Moreover, the government had no reason to confine its

search to "key words" such as the names of the baseball play-ers. "Computer files are easy to disguise or rename, and were we to limit the warrant to such a specific search protocol, much evidence could escape discovery simply because of [the defendants'] labeling of the files." *Id.* Such a limited search could easily have overlooked documents crucial to the investi-gation, such as the specimens at Quest, which were identified only by number. *See supra* pp. 1086-90.

**[22]** We do not discern a violation of the Fourth Amend-ment's requirements simply because the agents determined, upon the review and recommendation of a computer special-ist, that certain intermingled files could not be feasibly sorted on-site.[48] As we explained in *Tamura*, and reiterated in *Adjani* and *Hill*, the seizure of electronic evidence can entail complex sifting efforts. By obtaining from a neutral magistrate permis-sion to seize intermingled documents under a specific proto-col, the government respected privacy interests while pursuing the law enforcement. The agents' ultimate decision to remove relevant data for off-site review stemmed not from disregard of privacy rights, but from sensitivity to the ongoing disruption caused by the search to CDT—an innocent third party in the underlying investigation.

4

**[23]** Our determination that the search and seizures at CDT were valid provides a necessary component of our legal anal-ysis of Judge Mahan's order granting the Rule 41(g) motion in the District of Nevada. Judge Mahan premised his order on the legal conclusion that the government unlawfully seized

---

[48]We do not reach the government's argument that the "plain view" exception to the warrant requirement justified seizure of the intermingled evidence, because the evidence fell within the scope of the search warrant. *See Beusch*, 596 F.2d 871 ("Because we hold that the items seized were covered by the terms of the warrant, we find it unnecessary to deal with the Government's contentions that they were admissible under the 'plain view' exception to the warrant requirement.").

intermingled data from CDT and could not use that data to support an expanded search warrant in the District of Nevada. Our *de novo* legal analysis shows that Judge Mahan misinterpreted *Tamura*. A lawful search does not produce poisonous fruit. Because the CDT search was lawful, the information seized in that search provided a legitimate basis for expanded warrants in the District of Nevada. As we explained in *Adjani*: "There is no rule . . . that evidence turned up while officers are rightfully searching a location under a properly issued warrant must be excluded simply because the evidence found may support charges for a related crime (or against a suspect) not expressly contemplated in the warrant." 452 F.3d 1151; *cf. Beusch*, 596 F.2d at 877 ("[A]s long as an item appears, at the time of the search, to contain evidence reasonably related to the purposes of the search, there is no reason—absent some *other* Fourth Amendment violation—to suppress it." (emphasis added)); *Tamura*, 694 F.2d at 597 (noting that although the agents unambiguously had flouted the limits of the search warrant "we cannot say, although we find it a close case, that the officers so abused the warrant's authority that the otherwise valid warrant was transformed into a general one, thereby requiring all fruits to be suppressed").

Furthermore, an order to return property under Rule 41(g) is inappropriate where "the government's need for the property as evidence continues." *United States v. Fitzen*, 80 F.3d 387, 388 (9th Cir. 1996) (internal quotation marks omitted); *United States v. Mills*, 991 F.2d 609, 612 (9th Cir. 1993) (same). "If the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable." Fed. R. Crim. P. 41(g), advisory committee's note. It is when the government *no longer needs* the property as evidence in an investigation that a presumption in favor of return arises. *Fitzen*, 80 F.3d at 388.

**[24]** A return of property should follow only a particularly egregious violation: "The issue is whether the Government's conduct was sufficiently reprehensible in this case to warrant

this sanction." *Ramsden*, 2 F.3d at 327. In *Ramsden*, we refused to impose this extreme sanction on police who had time to obtain a warrant but made no effort to do so and "simply chose not to comply with [their] obligations under the Fourth Amendment." *Id.* at 325, 327. The government's behavior in this case was reasonable and fell far short of the egregious and unchecked intrusions that might justify a return of property under Rule 41(g).[49]

[25] The government's seizures were neither unreasonable nor exceeded the four corners of the warrants. Our technologically advancing world combines in novel forms the kind of data that in a previous age might have been segregated. Parties are not immunized from law enforcement simply because they choose to store data in complex or integrated formats. We conclude that the district court abused its discretion by granting the Rule 41(g) motion based upon its contrary, and erroneous, view of the law.[50]

---

[49]We do not belabor the government's alleged failure to follow its own internal guidelines. The dissent takes note that the U.S. Attorney's manual states "that a search warrant should normally not be used to obtain confidential materials such as treatment records," and that the Department of Justice's guidelines disfavor use of a search warrant where a subpoena would suffice. *See* Dissent at 1165. The existence of those guidelines is not disputed. Yet, quite simply, the government's guidelines do not dictate what is "reasonable" under the Fourth Amendment. If its guidelines did so, the government would have every reason to enact permissive internal rules. We have no reason or authority to give the government that perverse incentive.

[50]We do not hold that the government enjoys a right to "wholesale" seizure of evidence without judicial authorization; indeed, our decision stands for the opposite. *See supra* Section IV; *see also Tamura*, 694 F.2d at 594-96.

We do not doubt that a different case might present facts under which the seizure of intermingled documents would constitute an "unreasonable search[ ] and seizure[ ]." U.S. Const. amend. IV. But that case is not presented here. The government obtained proper authorization in the form of a search warrant protocol addressed specifically to the seizure of intermingled computer documents. The search warrant was obtained "upon proba-

V

We next consider the government's appeal of Judge Illston's order quashing the May 6 subpoenas, which sought from CDT and Quest the drug testing records and specimens for all MLB players who tested positive for steroids.[51] Under Fed. R. Crim. P. 17(c)(2), a "court may quash . . . [a] subpoena if compliance would be unreasonable or oppressive." The district court found that the May 2004 subpoenas constituted harassment and were unreasonable.[52]

To support its finding, the district court pointed to *United States v. American Honda Motor Co.*, 273 F. Supp. 810 (N.D. Ill. 1967). In *American Honda*, the government issued subpoenas that were "substantially identical" to one another but in different locations. *Id.* at 819. As a result, Honda was faced with producing the same documents repeatedly, and the court found this to be harassment. *Id.* at 819-20. *American Honda*, however, does not preclude the government from pursuing the same information through the contemporaneous issuance of subpoenas and applications for search warrants.

We addressed the issuance of contemporaneous search warrants and subpoenas in *In re Grand Jury Subpoenas Dated December 10, 1987*, 926 F.2d at 854. There we upheld the validity of the subpoenas against the challenge that "the subpoenas were served at the same time as the search warrants

---

ble cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Because our holding reaffirms that searches of electronic databases must conform to the requirements of the Fourth Amendment following the reasoning of *Tamura*, the dissent's fear that all medical databases and voluntary drug testing programs will be put at risk is utterly unfounded. *See* Dissent at 1137-38, 1184-88.

[51]We review a district court's decision to quash a grand jury subpoena for abuse of discretion. *In re Grand Jury Subpoenas*, 803 F.2d at 496.

[52]The district court did not find that the subpoenas were oppressive.

and the federal agents attempted to 'enforce' the subpoenas through immediate seizure of the documents." *Id.* at 854. Noting that the challenge to the subpoenas received no support in precedent, we clarified the differences between subpoenas and search warrants:

> Subpoenas are not search warrants. They involve different levels of intrusion on a person's privacy. A search warrant allows the officer to enter the person's premises, and to examine for himself the person's belongings. The officer, pursuant to the warrant, determines what is seized.

*Id.* By comparison:

> Service of a forthwith subpoena does not authorize an entry into a private residence. Furthermore, the person served determines whether he will surrender the items identified in the subpoena or challenge the validity of the subpoena prior to compliance.

*Id.* We concluded that "[t]hese differences are not eliminated by the fact that the search warrants and subpoenas were delivered at the same time" and observed that the complaining party had "failed to show that the papers that are described in the subpoenas are outside the scope of a legitimate investigation by the grand jury." *Id.* at 854-55. In addition, we specifically emphasized the fact that the defendant was given almost a month to comply with the subpoenas. *Id.* at 854.

[26] Therefore, the district court erred in finding the issuance of subpoenas and the contemporaneous execution of search warrants to be unreasonable. The Players Association has not argued that the evidence sought by the subpoenas is "outside the scope of a legitimate investigation by the grand jury." *Id.* at 855. The subpoenas were not returnable on the same day that the search warrants were executed. As in *In re Grand Jury Subpoenas*, the return dates on the subpoenas

were over a month from the date on which the warrants were executed. The district court declared the May 6 subpoenas an "unreasonable insurance" policy, but it failed to recognize the different purposes and requirements of the warrant as compared to the subpoena and the legitimate concern that production of relevant evidence to the grand jury would be unduly delayed. *See id.* at 854. It was error to conflate the two distinct tools. Insurance it may have been; but, under the Fourth Amendment, unreasonable it was not.

The district court also deemed the government's actions unreasonable because it found that the agents sought search warrants in three separate districts in an attempt to avoid a ruling on the motion to quash the existing subpoenas of January and March 2004. We note that granting the motion to quash would not have prevented the government from seeking the search warrants, particularly given the existence of probable cause. Unlike a subpoena, a search warrant may be obtained only upon a showing of probable cause—a burden the government sometimes considers necessary to establish in order to obtain certain production of evidence.[53] In contrast, a grand jury subpoena may issue simply because an Assistant United States Attorney believes the evidence may assist the grand jury in furthering the progress of an ongoing investigation which may never establish probable cause to charge anyone. If a subpoena based on the lesser standard of evidence does not withstand review, it does not follow that a search warrant premised on a far higher evidentiary showing could not be authorized. As the Fourth Circuit has noted, "the fact that a grand jury subpoena existed . . . at the time of the search obviously had no effect upon whether probable cause

---

[53]Significantly, while a subpoena may be quashed, a "person to be searched has no lawful way to prevent execution of the warrant." *In re Grand Jury Subpoenas Dated December 10, 1987*, 926 F.2d at 854. His remedy for an unlawful search and seizure or for the deprivation of property is to seek return of anything seized under Fed. R. Crim. P. 41(g), or, if charges are filed, to move to suppress use of the evidence against him at trial, *see* Fed. R. Crim. P. 12(b).

existed to search . . . for documents which were properly included within the warrant's scope." *United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 238 (4th Cir. 2001), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004).

As such, the district court rested its order on legally insufficient grounds, and abused its discretion in granting the motion to quash. *See United States v. Iverson*, 162 F.3d 1015, 1026 (9th Cir. 1998).

## VI

Finally, we address the Non-Party Journalist's Motion To Unseal, filed on November 23, 2005 by Joshua A. Gerstein. Gerstein seeks access to "the dockets for these appeals and the cases below, the district court opinions and/or orders that are the subject of these appeals, and all briefs filed with this Court."[54] We have jurisdiction over these documents, because the district courts' records transferred to us upon appeal. *See* Fed. R. App. P. 11.

Although not a party, Gerstein enjoys standing to file the motion based upon his constitutional interest in the proceedings:

> Under the first amendment, the press and the public have a presumed right of access to court proceedings and documents. . . . This presumed right can be overcome only by an overriding right or interest "based on findings that closure is essential to preserve

---

[54]Oral proceedings before this court on November 15, 2005, were open to the public. On November 9, 2005, CDT and MLB filed an unopposed Motion To Seal Courtroom During Oral Argument. We denied the motion the next day. On November 14, 2005, CDT and MLB filed a Motion for Reconsideration of Motion To Seal Courtroom During Oral Argument, which the government joined. We denied the motion the same day.

higher values and is narrowly tailored to serve that interest."

*Oregonian Publ'g Co. v. District Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1985)).[55] The Supreme Court has noted the particular interest of media members in "publish[-ing] information concerning the operation of government." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).

To decide whether Gerstein's interest justifies unsealing portions of the records, the court also must consider the privacy interests of the litigants, for "the right to inspect and copy judicial records is not absolute." *Id.* In the appeals at bar, the records contain extremely sensitive information, especially the drug testing records. If revealed, this information could adversely affect the reputations of many competitive baseball players. Therefore, the motion to unseal requires a careful balancing of the interests at stake. *See id.* (noting that access to judicial records may be limited to protect the privacy interests of the litigants, such as to avoid disclosure of "sources of business information that might harm a litigant's competitive standing").

**[27]** Although we have jurisdiction to conduct a merits analysis of the motion to unseal, the district courts—having greater familiarity with the records[56]—are in a better position to balance the privacy interests and to determine which materials are protected grand jury materials. *See* Fed. R. Crim. P.

---

[55]Gerstein premises his motion on 9th Cir. R. 27-13(c). That rule states: "During the pendency of an appeal, any party may file a motion with this court requesting that matters filed under seal either in the district court or in this court be unsealed. Any motion shall be served on all parties." *Id.* (emphasis added). Although Joshua Gerstein is not a "party" under this rule, his standing derives from his constitutional interest and does not depend upon the applicability of 9th Cir. R. 27-13(c).

[56]Sensitive portions of the records were neither revealed nor discussed at oral argument before this court. *See supra* note 54.

6(e). Therefore, we refer the Gerstein motion to the district courts for consideration.

## VII

To summarize the resolution of these consolidated appeals:

1) We have no jurisdiction to address the legal foundation for the grant of the Rule 41(g) motion in the Central District of California, although we recognize that our authoritative interpretation of *Tamura* conflicts with the vision of *Tamura* upon which that order was based. The government cannot obtain redress for any alleged errors or impropriety in that order, where it failed to object in a timely manner. The government's appeal of the grant of the Rule 41(g) motion is DISMISSED for lack of jurisdiction; the order of the Central District of California denying the government's motion for reconsideration is AFFIRMED.

2) The government's seizures at the Quest facility in Las Vegas were reasonable under the Fourth Amendment. The order of the District of Nevada granting the Rule 41(g) motion is REVERSED.

3) The record, illuminated by caselaw, reveals that the subpoenas to CDT and Quest, which covered the same evidence as the contemporaneous search warrants, were not unreasonable and did not constitute harassment. The order of the Northern District of California quashing the May 6 subpoenas is REVERSED.

**Volume 2 of 2**

THOMAS, Circuit Judge, concurring in part and dissenting in part:

One of the three extremely able district court judges who rejected the government's argument summarized it best, stating: "What happened to the Fourth Amendment? Was it repealed somehow?"

Although it only had a search warrant for data concerning eleven Major League Baseball players, the government seized

thousands of medical records and test results involving every single Major League Baseball player. The government did not stop there, seizing thousands of other medical records for individuals in thirteen other major sports organizations, three unaffiliated business entities, and three sports competitions. The government now seeks to retain all of the medical information it obtained about persons who were not the subject of any criminal inquiry.

The stakes in this case are high. The government claims the right to seize and retain—without warrant or even a suspicion of criminal activity—any patient's confidential medical record or other confidential personal information contained in a computer directory so long as it has a legitimate warrant or subpoena for any other individual patient's record that may be stored on the same computer. The government attempted to justify this novel theory on a breathtaking expansion of the "plain view" doctrine, which clearly has no application to intermingled private electronic data.

The majority ignores the government's plain view argument—a theory rejected by every district judge involved in this case. Instead, the majority invents a new justification for approving the seizures. It holds that the boilerplate terms of a computer search warrant justify both the seizure of massive amounts of confidential medical information about persons not suspected of any criminal activity *and* the subsequent warrantless search of the information. Under the majority's rationale, the government may now seize anyone's private medical records and other confidential personal information, and remove the records for a later warrantless search, so long as those records are intermingled with records that are responsive to a warrant and the government can justify that on-site sorting of those records would be impractical.

The consequences of this decision are profound. Today's decision will allow the government unprecedented easy access to confidential medical and other private information

about citizens who are under no suspicion of having been involved in criminal activity. At a time when our medical institutions are working diligently to provide physicians with easy nationwide electronic access to patient records in order to improve the care and treatment of our citizens, the opinion poses a very serious threat to the confidentiality of patient records and ultimately to the effective delivery of health care itself.

The majority's holding will also significantly and adversely impact the viability of voluntary workplace drug testing. As the National Chamber of Commerce has pointed out in its amicus brief, today's decision will make it very unlikely that employees or unions will agree to any voluntary employer drug testing in the future, as any promise of confidentiality has now been rendered completely illusory. It will make efforts to curb substance abuse in the workplace harder, not easier.

The majority's holding also conflicts with the procedures detailed by our Circuit in *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982) for the appropriate and constitutional processing of seized information not responsive to a warrant that is intermingled with data that is responsive to a warrant.

The majority also improperly rejects the factual findings of the district judges, to which we owe deference, and adopts wholesale the government advocate's view of events. The careful findings and conclusions of the three distinguished district judges who all rejected the government's position are completely supported by the voluminous record.

For these reasons, I respectfully dissent.

## I

The investigation in this case ostensibly involved Bay Area Lab Co-Operative, popularly referenced as "Balco." The gov-

ernment suspected Balco of distributing illegal steroids to certain athletes, including some Major League Baseball players. The government knew that, pursuant to a collective bargaining agreement between the Major League Baseball Players Association ("Players Association" or "MLBPA") and Major League Baseball, confidential testing had been analyzed by Comprehensive Drug Testing, Inc. ("CDT"), and other laboratories, for the sole purpose of determining whether Major League Baseball should adopt an individualized steroid testing program.

Through the collective bargaining agreement, the players were assured that the testing would be anonymous and confidential, and that the samples and individual data would be destroyed upon tabulation of the results. The only object of the exercise was to determine the approximate magnitude of apparent steroid use with the goal of fashioning appropriate policies to address it. The collective bargaining agreement acknowledged and anticipated that the tests for some players might well yield positive results due to the ingestion of legal and proper over-the-counter supplements.

Although information developed by the government in its criminal investigation pointed only to specific individuals who might be involved with Balco, the government served a grand jury subpoena on CDT on January 16, 2003, seeking drug tests for all major league baseball players. After receiving the subpoena, the Players Association and CDT contacted the United States Attorneys' Office to discuss their concerns with the breadth of the subpoena. At the government's request, the Players Association, CDT, and Major League Baseball prepared and presented a "white paper" to the government detailing the provisions of the collective bargaining agreement pertaining to testing, with emphasis on the many confidentiality provisions, and raising concerns about the invasion of the constitutionally-protected privacy interests of the players who were not involved in the Balco investigation.

The Players Association and CDT assured the government in writing that CDT would maintain all of the subpoenaed records until the disputes were resolved by negotiation or litigation. On February 4, 2003, the Chief of the Criminal Division wrote the counsel for CDT indicating that the government had accepted the assurances by CDT that none of the materials sought by the subpoena would be destroyed or altered pending the government's reconsideration of the subpoena and a motion to quash the subpoena, if filed.

On February 12, 2004, the grand jury returned a 42-count indictment against Victor Conte, Jr. (Balco's founder), James J. Valente (Balco's Vice President), Greg F. Anderson (a trainer), and Remi Korchemny (a track coach). The charges against the defendants included conspiracy to possess with intent to distribute anabolic steroids, possession with intent to distribute anabolic steroids, introduction and delivery of misbranded drugs into interstate commerce with intent to defraud, and misbranding of drugs held for sale with intent to defraud.

On March 3, the government served a second grand jury subpoena on CDT, seeking information on only eleven named baseball players. However, it did not withdraw the January 16 subpoena. On April 7, with no compromise reached and with a return date passed, the Players Association filed a motion in the Northern District of California in San Francisco to quash the CDT subpoena. The motion was assigned to Judge Jeffrey S. White.

After learning that a motion to quash would be filed but before the motion could be heard, the government applied for a search warrant to search the CDT offices for the same information it was seeking in the grand jury subpoena. The search warrant application was made some 240 miles away in another federal judicial district, without notice to the Players Association or to the district court in the Northern District of California.

In the search warrant proceedings in the Central District of California, the government never brought to the magistrate judge's attention that there was a motion pending before Judge White in the Northern District of California to quash the grand jury subpoena. The affidavit did not disclose that the Players Association had joined the motion. Rather, the affidavit stated:

> The referenced grand jury subpoena, for the items listed in Attachment B, was issued; however, while not denying that they have the requested materials, CDT has declined to comply with the subpoena and has stated its intent to attempt to quash the subpoena.[1]

The affidavit did not disclose that CDT had agreed in writing to keep the data and other materials secured until the scope of the grand jury subpoena was settled, either through negotiation or a ruling on a motion to quash. Rather, the affidavit justified removing computer data and equipment from the searched premises on the basis that the computer data could be concealed, altered, or destroyed by the user.

The affidavit also informed the magistrate judge that "[c]omputer hardware and storage devices may contain 'booby traps' that destroy or alter data if certain procedures are not scrupulously followed." It noted that computer data was "particularly vulnerable to inadvertent or intentional modification or destruction."

---

[1]Some months later, Judge Illston asked the government: "Did you explain to Judge Johnson what was happening before Judge White, even on the day that you got him to issue the warrant?" Government counsel replied, "We did inform Judge Johnson of the existence of the grand jury subpoena and it's in the warrant application of Judge Johnson that defense had indicated that it wanted to move to quash the subpoena. So we did indicate to Judge Johnson there was a disputed grand jury issue. Yes, it was disclosed to Judge Johnson." Neither the warrant application nor the affidavit filed in support of the application contain any reference to pending proceedings before Judge White.

The government did not have any evidence or reason to believe that CDT had engaged in steganography, booby-trapping computers, or any type of data destruction or alteration. To the contrary, it had accepted in writing CDT's assurances "that CDT will maintain and preserve all materials called for by the first subpoena as well as any materials called for by the new subpoena" and that "CDT would not destroy or alter any of the materials called for by either of the subpoenas." However, the plain import of the application was that CDT was improperly resisting compliance with a valid grand jury subpoena and data was in jeopardy of being destroyed.

Based on the government's application, a search warrant was issued by Magistrate Judge Jeffrey W. Johnson in the Central District of California in Los Angeles. The warrant authorized the seizure of records regarding drug specimens, testing, and test results of only ten specifically named Major League baseball players. The warrant also provided that if the computer data seized did not fall within any of the items to be seized or was not otherwise legally seized, the government would return the data. The affidavit provided by Special Agent Novitzky in support of the issuance of the warrants stated that obtaining information to link the test results to individual players was necessary "to ensure that samples of individuals not associated with Balco are left undisturbed."

The warrant was issued one day after the motion to quash the grand jury subpoena had been filed in the Northern District of California—creating the clear implication that the government was attempting to prevent Judge White from considering the motion to quash on the merits by seizing the property after ex parte presentation to another judge. Upon arrival at the premises of CDT on the morning of the search, Special Agent Novitzky and other agents discussed with CDT's attorney the need to search CDT's computers.

The information sought in the search warrant was contained in three places: a segregated list only containing information

about the ten athletes that were the subjects of the search warrant; a master list of the drug test results for all Major League Baseball players; and a computer directory (often referred to as the "Tracey directory") that contained information and medical test results for hundreds of other baseball players and athletes engaged in professional sports. Counsel for CDT requested that all material pertaining to the specific items listed in the warrant be reviewed and redacted by a magistrate judge or special master before it was seen by the government, pursuant to the proper procedure described in *Tamura*. The government refused the request.[2] The government also rejected CDT's offer to provide the records it had already segregated concerning the small subset of players at issue.

In addition to the segregated materials, the government seized the master list, all of the voluminous data in the Tracey Directory, lists of teams and players and drug testing details, and eleven diskettes, all of which contained drug-test results on hundreds of Major League Baseball players and other athletes. The agents searching the Tracey directory at the scene concluded that certain of the subdirectories appeared to contain information not called for by the warrant. In fact, the directory contained 2,911 files that had nothing to do with Major League Baseball drug testing, but rather contained test results for numerous other sports entities and business organizations. However, instead of copying only the subdirectories that pertained to Major League Baseball, the agents copied the entire directory. Dr. Jean Joseph of CDT later stated in an affidavit that the directory was easily searched by key word and would have provided the test information about the ten players in a short period of time.

Judge Cooper later specifically found that "[o]nce the items

---

[2]Department of Justice Guidelines provide that, in cases involving confidential patient information, a search warrant "shall be executed in such a manner as to minimize, to the greatest extent practicable, scrutiny of confidential materials." 28 C.F.R. § 59.4(b)(4).

were seized the requirement of the search warrant that any seized items not covered by the warrant be first screened and segregated by computer personnel was completely ignored." She further found that Agent Novitzky himself reviewed the seized computer data and used what he learned to obtain the subsequent search warrants issued in the Northern District of California, the Central District of California, and Nevada.

After the initial search, and based on the search results, the government sought and obtained that day a second search warrant from Magistrate Judge Johnson for a search of a storage facility maintained by CDT.

On the same day, the government also applied for a search warrant in the District of Nevada. The warrant sought information in the business files of Quest Diagnostics, Inc., a laboratory that had also been involved in the administration of Major League Baseball's drug testing program in 2003. The warrant was limited to information concerning the ten baseball players identified in the Los Angles search warrant. The affidavit filed in support of the warrant did not disclose the history of the issuance of the grand jury subpoena or the filing of a motion to quash the subpoena. Based on the information provided by the government, Magistrate Judge Lawrence Leavitt issued the warrant, and the warrant was executed.

On April 9, 2004, the Players Association arranged an emergency hearing before Judge White, before whom the motion to quash the grand jury subpoena was pending. The Players Association sought an order restricting the government from disseminating any information it had obtained until the Players Association had an opportunity to litigate the motion to quash or a Rule 41 motion to return the seized property. The government argued that Judge White had no jurisdiction over the items seized pursuant to the search warrants, even though the grand jury subpoena sought the same materials.

The government represented to the court that it would not disseminate the information and would negotiate in good faith about the seized items. Judge White accepted that representation. He noted that he did not have jurisdiction over the items seized pursuant to the warrants, but that the motions to quash the grand jury subpoenas remained pending before him. Judge White acknowledged that the position of the Players Association was "well taken with respect to the U.S. Attorney's manual and the government allegedly not following proper procedure," but that the Players Association had other available remedies to resolve that issue on the merits.

On April 22, 2004, the government wrote CDT indicating that it was withdrawing the January 16, 2004, subpoena and modifying the subpoena of March 3, 2004. The government did not inform Judge White of these actions and the January 16 subpoena was never withdrawn.

On April 24, CDT and the Players Association filed a motion in the Central District of California for return of the seized property or, in the alternative, appointment of a special master to redact those records so that the government retained drug test results for only the ten players named in the warrant.

On April 30, 2004, the government filed its opposition to the motion to return property in the Central District. In its opposition, despite the existence of an agreement with CDT that CDT would not destroy or alter documents, the government argued that it "had good-faith reasons to believe that CDT was detrimentally delaying the investigation, and that there was some danger of the sought-after records being jeopardized." The government also argued that this jeopardy justified proceeding with a search warrant under DOJ guidelines.

On the same date, April 30, 2004, based on what it had found in the first search, the government sought a new search warrant in the Northern District of California in San Jose for CDT electronic files it already had in its possession in the

Tracey Directory concerning all players whose test results were positive.

In contrast to the affidavit supplied in the first warrant application, which purported "to ensure that samples of individuals not associated with Balco are left undisturbed," the affidavit of Agent Novitzky in support of this warrant application sought "authorization to conduct a thorough review of all major league baseball-related computer data" and "to seize all data pertaining to illegal drug use by any member of major league baseball."

The affidavit conceded that no specific information had been uncovered linking Balco to any individual baseball players beyond the ten listed in the April 7, 2004, search warrant. However, in contrast to the first warrant application, Agent Novitzky averred that even though no evidence had been developed to link the ballplayers who were not listed in the first warrant to Balco, "it is logical to assume that a review of the drug testing records for other players may provide additional evidence of the use of similar illegal performance-enhancing drugs which establishes a link to the charged defendants in the charged [Balco] case, given the relatively small number of professional baseball players and the closely-knit professional baseball community."

The affidavit in support of issuance of the warrant did not disclose that a grand jury subpoena had been issued for the same material and that a motion to quash the subpoena was pending in the very same district.

The affidavit also did not disclose that the parties were litigating in the Central District of California a motion for return of the seized property — the very property which was subject of the new search warrant request. Based on the information provided by the government, Magistrate Judge Howard W. Lloyd issued a new search warrant for the same material that the government had already searched and seized.

On May 5, 2004, the government sought a search warrant in the District of Nevada for information contained in the files at Quest Diagnostics concerning all baseball players who, according to the information collected in the CDT search, had tested positive for steroids. The application conceded that there was no specific evidence linking these players to Balco. The warrant was issued by Magistrate Judge Leavitt. The government took a large number (later reported by the government to be 250 to 300 because of multiple samples given by the players) of physical samples of bodily fluids and transported them to a lab in Los Angeles.

On May 5, 2004, the government sought a search warrant in the Central District of California in Los Angeles before a different magistrate judge for all information contained in the files at CDT concerning all baseball players who, according to the information collected in the CDT search, had a positive marker for steroids. The application conceded that there was no specific evidence linking these players to Balco. Neither the application nor the affidavit filed in support of the application disclosed the pending proceedings concerning the grand jury subpoenas. Based on the information provided by the government, the warrant was issued by Magistrate Judge Rosalyn Chapman.

On May 6, 2004, after it had executed the search warrants, the government served grand jury subpoenas on CDT and Quest for the same materials it had sought in the April 30 and May 5 search warrants. The subpoena contained the names of the baseball players that had allegedly tested positive, even though the government knew that the information Quest possessed was only identifiable by number and even though the government had assured the Players Association and Judge White that it would not disclose the names. The government sent a letter to Quest Diagnostics instructing the company not to disclose to anyone the government's request for documents "indefinitely" because "[a]ny such disclosure could impede

the investigation being conducted and thereby interfere with the enforcement of the law."

On May 21, 2004, CDT and the Players Association filed a motion in the District of Nevada for a return of the property seized from Quest Diagnostics. On June 7, 2004, CDT and the Players Association filed a motion in the Northern District of California for return of the electronic documents seized from CDT pursuant to the April 30 search warrant issued by Magistrate Judge Lloyd in the Northern District.

On July 9, 2004, Judge White held a hearing on the motion to quash the grand jury subpoenas, but deferred action pending rulings on the motions for return of property seized pursuant to the search warrants.

On August 9, 2004, Judge Susan Illston held a hearing on the motion for return of the electronic data seized by the government pursuant to the April 30 warrant. When asked by Judge Illston why the government hadn't just waited to let Judge White rule on the motions to quash the grand jury subpoena rather than seeking search warrants for the same material, the government responded:

> What the government really perceived ultimately as a conscious decision on the part of the Major League Baseball Players Association and the other parties associated with it just refused to comply with what the government felt was [sic] legitimate grand jury subpoenas.

Later in the hearing the government argued that the search warrant was necessary because a motion to quash had been filed.

Counsel:   The concern here was, to say, okay, we're going to face a brick wall from this legal avenue . . . .

Judge:     What brick wall?

Counsel:  The brick wall was . . .

Judge:     Judge White?

Counsel:  No, no, not at all. It was the concern that the requests or that discussions about moving to quash the subpoena would be something that would be dragged out.

At a later hearing, counsel for government confirmed that it would not have sought to obtain the search warrants if the affected parties had not filed a motion to quash the grand jury subpoena.[3] However, the Department of Justice Guidelines provide that "The fact that the disinterested third party possessing the materials may have grounds to challenge a subpoena or other legal process is not in itself a legitimate basis for the use of a search warrant." 28 C.F.R. § 59.4.

The government primarily argued that, even though the material seized may not have been authorized under the search warrant, seizure was appropriate under the "plain

---

[3]A hearing on December 10, 2004, discussed *infra*, contains this colloquy:

Counsel:  And the government never would have done the search warrants if the grand jury process could have worked out. But it didn't. I feel —

Court:     Say that last thing one more time. What you —

Counsel:  What I just said was we may not have ever done the search warrants if the subpoena process worked out.

Court:     But, I mean, there was a subpoena process pending in this building before Judge White.

Counsel:  Yes.

Court:     At the time you went and got your search warrants, and you didn't allow that process to complete itself.

Counsel:  That is true.

view" doctrine. The court engaged in an extensive colloquy about the search, ascertaining that the data was contained in a file that could not be accessed readily without assistance, and that the agent had to scroll through 1,200 results to obtain the positive tests that formed the basis of the later search warrants. After noting that the government had not provided any case to support its contention that the plain view doctrine applied in the computer context, Judge Illston made the following findings:

> I find absolutely staggering the implications about what you say about the plain view doctrine in the computer set up. In a way nothing is in plain view because with the disk you look at it, you don't see anything until you stick it in the computer and it does take quite a lot of work really to bring it up on the screen.

> So, it's not in plain view in the sense of walking into the room and seeing the scale on the desk. It takes a whole lot of work to get there.

> First off, none of it is cursory, there are whole industries that have developed in order to make it possible for the disk to show up on the screen that way. So it's not cursory review. I don't think it's plain view. I don't think I have to go that far or make that kind of choice with respect to issues that are certainly going to arise. . . . Where it requires sorting through information which really is on a data base, somehow it's being organized in different formats, you could organize it in a format based on the ten names, instead of taking it in other kinds of formats, then scrolling across and taking names and information off the screen, when it's clearly information that isn't part of what was originally within the authorized search warrant, I just think is impermissible.

Judge Illston then granted the motion for return of seized property, with the following findings from the bench:

So, having looked at the *Ramsden* factors set out, [there are] apparently four factors. One, whether the government displayed a callous disregard for the constitutional rights, two, whether the [movant] has an individual right and need for the property he wants returned, three, whether the [movant] would be irreparably injured by denying the motion for return of property, and four, whether the [movant] has an adequate remedy at law for a redress of his grievance. I find all four factors have been met here.

I think the government has displayed, in the chronology of things that we've seen, in the way that the case was taken from one judge to another judge, in the way that as soon as it was challenged in one court, it was immediately litigated in another court without full information being shared among the courts, that to me makes it a callous disregard for constitutional rights. I think, it's a seizure beyond what was authorized by the search warrant, therefore it violates the Fourth Amendment.

Number two, I think [that both movants] here have an interest and need for the property returned. I think they need it returned and not so much because they need it back, they got it, you got it, I think what they need to get back from you what they have, what you've taken from them because of the privacy rights and the circumstances under which this material was given.

Whether the [movant] would be irreparably injured by denying the return of the property, I think they would, and I think indeed there would be, that the injury that will be suffered by volunteers not

being able to confidently provide testing under promise of privacy would irreparably injure not only major league baseball, I can't imagine that there's going to be any voluntary agreement to do this kind of testing, that's probably over with already, but also just has implications that are very negative for these [movants], and whether the [movant] has an adequate remedy at law, I don't think there is any remedy at law for the redress of these grievances.

I'm going to grant the motion.

On August 13, in the Central District of California, Magistrate Judge Johnson issued a report and recommendation recommending denial of the motion for return of property seized at CDT.

On August 19, in the District of Nevada, Judge James C. Mahan held a hearing on the motion filed by the Players Association for the return of the property seized at Quest Diagnostics pursuant to the search warrants. The government did not disclose to Judge Mahan or the Players Association that it had served on Quest a grand jury subpoena for the same materials, coupled with a letter instructing Quest to keep that fact confidential indefinitely. At the conclusion of the hearing, Judge Mahan orally granted the motion. On September 7, Judge Mahan filed a written order granting the motion for return of the property. Judge Mahan found, in relevant part, that:

> 2. Under *Ramsden v. United States*, 2 F.3d 322 (9th Cir. 1993), this Court has equitable jurisdiction to order return of that seized property. All of the factors identified in *Ramsden* supporting jurisdiction are present. The government callously disregarded the affected players' constitutional rights. The MLBPA, as representative for the players, has an individual interest in and

need for the property that it wants returned. The MLBPA would be irreparably injured if the property were not returned. And the MLBPA has no adequate remedy at law for redress of the grievances.

3.  Under the particular circumstances of this case, it was unreasonable for the Government to refuse to follow the procedures set forth in *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), upon learning that drug-testing records for the ten athletes named in the original April 8 warrants executed at Quest and at Comprehensive Drug Testing, Inc. were co-mingled with records for other athletes not named in those warrants.

After issuance of the order, the government declined to return the material seized from Quest in Nevada, contending it was entitled to retain it under the authority of the new May 6 grand jury subpoena. To that end, the government filed a stay motion with Judge Mahan, arguing that it had a right to retain the data and samples based on the May 6 grand jury subpoena, which had issued after the seizures of the material had occurred. The government argued that Judge White was the only judge who had jurisdiction to decide that issue. Judge Mahan denied the stay motion. The government maintained that the May 6 grand jury subpoenas independently authorized retention of the data and specimens; therefore, the Players Association and CDT filed a motion to quash the May 6 subpoena in the Northern District of California.

On October 1, 2004, in the Central District of California, Judge Cooper declined to adopt Magistrate Judge Johnson's recommendation, and granted the motion for return of the seized CDT property. She noted that she joined "an apparently ever-increasing number of district judges who have held that the Government's execution of the Search Warrant at

issue in this case demonstrated a callous disregard for the constitutional rights of the movants and their members."

With respect to the *Ramsden* factors, Judge Cooper found:

> All four considerations weigh in favor of the moving parties in this case. In assessing whether the government displayed a callous disregard for the rights of the persons whose records were seized, it is important to focus on the Ninth Circuit opinion in *United States v. Tamura*, 694 F.2d 591 (1982). At the time of the search, *Tamura* was certainly settled law in the Circuit, and *Tamura* establishes a procedure to be followed when documents to be seized are intermingled with other documents. ". . . . [T]he wholesale *seizure* for later detained examination of records not described in a warrant is significantly more intrusive, and has been characterized as 'the kind of investigatory dragnet that the fourth amendment was designed to prevent.'[citation]." *Id.* at 595. Therefore, law enforcement officials are to seal and hold such intermingled documents "pending approval by a magistrate of a further search . . . . Wholesale removal must be monitored by the judgment of a neutral, detached magistrate." *Id.* at 596. It is particularly telling in this case that just such a procedure was proposed to the Government at the time of the search, and rejected.

> Nor is the viewing of the seized files legitimized by the Plain View doctrine. Under the exception to the warrant requirement, an officer may seize what he plainly views, so long as he has a lawful right to access the evidence itself and its incriminating character is immediately apparent. *Horton v. California*, 496 U.S. 128, 136 (1990). Here, the agent did not have a lawful right to access the computer records and diskettes, and, as evidence provided in connec-

tion with the Motion reveals, the evidence observed is not necessarily incriminating. The Declaration of Dr. Joseph states that the ingestion of nutritional supplements can produce a "positive" test for steroids.

The Government demonstrated a callous disregard for the rights of persons whose records were seized and searched outside the warrants.

The second consideration, whether the moving party has an interest and need for return of the property, is easily answered. The athletes in question voluntarily submitted to urine testing for steroids, as part of an agreement that all results would remain confidential and be used only for statistical analysis. Their interest in privacy is obvious.

The third consideration, whether the moving party has an interest and need for return of the property is easily answered. The careers of these athletes could be profoundly, negatively affected by release of these records, and their return is vitally important. The harm they would suffer if the records were released (even if the positive tests are shown to be innocuous) would be irreparable.

Finally, it is evident that the movants have no other legal remedy. No motion to suppress the evidence is available to them; they are neither defendants nor suspects, and no case exists in which this issue could be litigated.

In addition to her findings and conclusions, Judge Cooper added these comments in a section labeled "Serious Concerns:"

The documents presented to the Court in connection with this Motion reveal extremely troubling

conduct on the part of the Government. The picture painted is one of almost desperate effort to acquire evidence by whatever means could be utilized. The Government negotiated with movants' attorneys over the breadth of the grand jury subpoenas; received assurances in writing that the records of the ten athletes would be secured while the Court resolved the issue, and the day after the issue was presented to a Court, went to another district and sought a search warrant. That conduct would be suspect in itself. But in seeking the warrant (not the correct procedure for obtaining documents for a third party who is not a suspect), the Government explained to the Magistrate that the records in question were in danger of being destroyed. This is blatant misrepresentation, as demonstrated by the records in this case.

Four days after Movants filed a motion before Magistrate Judge Johnson for return of the property, the Government obtained a further warrant from a Magistrate Judge in the Northern District of California. And while a motion for return of *that* property was pending, the Government obtained two more warrants in the Central District of California (not from Magistrate Judge Johnson) and in Nevada. The image of quickly and skillfully moving the cup so no one can find the pea would be humorous if the matter were not so serious.

Noting that "the Government is held to a far higher standard than has been demonstrated in this case," and that "this is the third District Court Order compelling the Government to return property illegally seized," Judge Cooper ordered return of the seized CDT property forthwith.

On December 10, 2004, Judge Illston held a hearing on the Players Association motion to intervene and to quash the May

6, 2004 grand jury subpoenas served on CDT and Quest. At the conclusion of the hearing, Judge Illston made the following oral findings and conclusions:

> I find that the MLBPA has the right to intervene in this matter under Federal Rule of Civil Procedure 24(a), as it has an interest in the samples and test results in the possession of CDT and Quest, which were created with the promise of anonymity under the mandatory testing of the 2002 collective bargaining agreement.

> The May 6th, 2004 subpoenas were the culmination of a series of actions taken by the government in order to prevent MLBPA and CDT's attempt to move to quash the January and March subpoenas. Instead of allowing the matter to be resolved in a single proceeding before Judge White, the government executed a series of search warrants in three different districts once it learned that petitioners would move to quash the January and March subpoenas.

> The government has provided no substantial explanation of why this course of action was necessary. Given that the government had no other basis for issuing the April search warrants and preempting the subpoenas served on Quest and CDT, the decision appears to have been a tactical decision to prevent the parties from raising objections before Judge White, which is unreasonable and constitutes harassment similar to the conduct in *United States v. American Honda*.

> Furthermore, the May 6th subpoenas were served after the government had obtained evidence pursuant to the April 7 and April 30 search warrants, which has now been determined to have been illegally seized. Some of the information sought in the May

> 6th subpoena was already in the government's possession at the time the subpoena was served on CDT and Quest; therefore, the Court finds that the May 6th subpoena served as an unreasonable insurance policy as recognized in the motion for the return of seized property cited in the papers, 681 F.Supp. [sic]
>
> For these reasons the court grants petitioner's motion to quash the May 6th subpoena served on Quest and CDT as an abuse of the grand jury process and unreasonable under Federal Rule of Criminal Procedure 17(c).

On October 18, 2005, as a result of a plea agreement, Balco founder Victor Conte received a sentence of eight months imprisonment, with four months of the sentence to be served in home confinement. James Valente, Balco's vice president, was sentenced to probation. Trainer Greg Anderson was sentenced to six months imprisonment, with three of the six months to be spent in home confinement. On February 25, 2006, track coach Remi Korchemny was sentenced to one year of probation.

In reviewing both the order quashing the grand jury subpoena and the orders granting the motions for return of property pursuant to Fed. R. Crim. P. 41(g), we review the factual findings of the district courts for clear error. *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 854 (9th Cir. 1991) (orders to quash grand jury subpoenas); *United States v. Marolf*, 173 F.3d 1213, 1216 (9th Cir. 1999) (orders on motions for return of property). We review orders quashing subpoenas for abuse of discretion. *United States v. Bergeson*, 425 F.3d 1221, 1224 (9th Cir. 2005) (citing *In re Grand Jury Subpoena*, 357 F.3d 900, 906 (9th Cir. 2004)). We review *de novo* a district court's denial of a motion for return of property pursuant to Rule 41(g). *Marolf*, 173 F.3d at 1216.

## II

Regarding the two preliminary jurisdictional questions—
(1) whether the Players Association had standing to file the
Fed. R. Civ. P. 41(g) motions for return of property on behalf
of its members, and (2) whether the government timely
appealed Judge Cooper's order granting the Rule 41(g)
motion—I agree with the conclusions reached by the majority.[4]
I also agree with the majority that Judge Cooper did not abuse
her discretion in denying the government's motion to recon-
sider certain findings made in her order.

## III

Application of the proper standard of review should have
settled this appeal without much ado. We review the findings
of fact underlying the district court's determination of lawful-
ness of a search for clear error. *United States v. Stafford*, 416
F.3d 1068, 1073 (9th Cir. 2005) (citing *United States v.
Deemer*, 354 F.3d 1130, 1132 (9th Cir. 2004)). Review under
the clearly erroneous standard is significantly deferential,
requiring a "definite and firm conviction that a mistake has
been committed," before a finding can be overturned. *Easley
v. Cromartie*, 532 U.S. 234, 242 (2001). As long as the dis-
trict court's account of the evidence is plausible in light of the
record viewed in its entirety, we may not reverse it even if we
are convinced that, had we been sitting as the trier of fact, we
would have weighed the evidence differently. *SEC v. Rubera*,
350 F.3d 1084, 1094 (9th Cir. 2003).

Here, the district courts made the factual finding that the
government did not comply with the terms of the CDT search
warrant in seizing the non-Balco data. The district courts
found, as a matter of fact, that the seizure of the non-Balco

---

[4]I acknowledge and appreciate the majority's willingness to revisit the
question of whether the government timely appealed Judge Cooper's
order.

data was not authorized by the warrant. The district courts found, as a matter of fact, that the government had not complied with the terms of the *Tamura* procedure. The district courts collectively found that the action of the government in seizing the property was so "egregious" that it rose to the level of a callous disregard for the rights of the property owners. Under our significantly deferential standard of review, that should be the end of the matter.

We review a district court decision to exercise its equitable jurisdiction under Rule 41(g) under the deferential abuse of discretion standard. *Ramsden*, 2 F.3d at 324. Similarly, we review district court decisions on motions to quash grand jury subpoenas for abuse of discretion. *In re Grand Jury Subpoena, Dated April 18, 2003*, 383 F.3d 905, 909 (9th Cir. 2004). Under the abuse of discretion standard, we cannot reverse unless we have a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. *Natural Resources Defense Council, Inc. v. Winter*, 2007 WL 2481465, *4 (9th Cir. 2007). Here, there is no doubt the district courts weighed the appropriate factors pertaining to the Rule 41(g) motion and elected to exercise equitable power to return property. There is also no doubt that Judge Illston based her decision on the motion to quash on a correct view of the law and appropriately considered all of the evidence. *In re Grand Jury Subpoena*, 383 F.3d at 909. On appellate review, we cannot say that these judges abused the discretion reposed in them.

The majority chooses instead to substitute its own factual findings concerning the government's compliance with the warrants and interpose its own *de novo* opinion as to the exercise of discretion. That is not our function. In addition, our appellate review ought to be significantly more deferential when we confront the uniform factual findings and collective exercise of judicial discretion of three experienced district judges from three separate judicial districts. However,

because our deferential standards of review were discarded in this case, I will proceed to a merits discussion.

IV

I agree with the majority that Judge Mahan properly exercised equitable jurisdiction over the Rule 41(g) motions.[5] *Ramsden* identified four factors that district courts must consider before exercising equitable jurisdiction to order the return of property, namely whether: (1) the government displayed a callous disregard for the constitutional rights of the movant; (2) the movant has an individual interest in and the need for the property he wants returned; (3) the movant would be irreparably injured by denying return of the property; and (4) the movant has an adequate remedy at law for the redress of his grievance. 2 F.3d at 324.

Although I agree with the majority that the district courts properly exercised equitable jurisdiction, I disagree with the majority's analysis in reaching that conclusion. Because the equitable jurisdictional analysis in large part drives the analysis of the merits of the Rule 41(g) decisions, it is important to detail my differences with the majority on this issue.

---

[5]Because Judge Cooper's order is not reviewable, like the majority, I review only Judge Mahan's order in this section. However, the legal analysis applicable to both orders is largely the same. Further, Judge Cooper's conclusive determination that the materials seized from CDT must be returned because they were taken in callous disregard of the non-Balco players' constitutional rights has an impact on the validity of Judge Mahan's order. Since the CDT materials were a necessary prerequisite for the granting of the Quest search warrant, the fact that those materials were improperly seized removes the foundation for the legality of the Quest warrant. Although the Quest warrant is not directly challenged in this case, I address below how the final order from Judge Cooper also serves to support the result reached by Judge Mahan.

A

The first *Ramsden* factor is whether the government displayed a callous disregard for the constitutional rights of the movant. The majority concludes the government did not. I respectfully disagree with that conclusion. The record entirely supports Judge Mahan's conclusion that the government displayed a callous disregard for the constitutional rights of the movants.

1

The doctrine of issue preclusion requires us to accept as decided that the government callously disregarded the non-Balco players' rights when it seized those players' records from CDT. *Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 329-30 (9th Cir. 1995). Judge Cooper ordered the CDT-seized property returned, holding that the government demonstrated a callous disregard for the constitutional rights of the movants and their members. That holding, now final, is entitled to *res judicata* effect. Because the affidavit submitted to Magistrate Judge Leavitt that formed the basis for the May 5, 2004, Quest search warrant relied on the materials Judge Cooper has now conclusively determined were seized in callous violation of the players' rights, the materials seized pursuant to the May 5 warrant are fruit of that poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391 (1920).

Indeed, the government's approach—using the results of one tainted search after another to justify the next search—was rejected decades ago by the Supreme Court. In *Silverthorne Lumber*, the Court considered a situation akin to the one at bar. In describing the government's argument in that case, the Court wrote:

> The proposition could not be presented more nakedly. It is that although of course its seizure was

an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act.

251 U.S. at 391.

The Supreme Court forcefully rejected this idea, stating that adoption of such a theory would "reduce[ ] the Fourth Amendment to a form of words." *Id.* at 392.

The Court concluded:

The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely the evidence so acquired shall not be used before the Court but that it shall not be used at all.

*Id.*

Judge Cooper declared the seizures illegal and ordered the material returned. That binding decision means that the government could not use the fruits of the search to justify its subsequent search in Nevada. The majority fails to explain how the government can disregard the players rights in seizing the spreadsheet from CDT, but not disregard their rights in *using* that spreadsheet to seize the urine samples themselves from Quest.

2

Even notwithstanding any preclusive effect stemming from Judge Cooper's order, the record more than amply supports Judge Mahan's ruling on its own merits.

The record supports the conclusion that the government sought and executed the search warrants and took subsequent legal action as a tactical measure to prevent the Players Association and CDT from litigating their motion to quash and other objections to the wholesale production of CDT data and thus the Quest data that the CDT materials begot.[6] The government applied for, and executed, the initial search warrants after CDT and the Players Association informed the government they would be filing a motion to quash the grand jury subpoenas. Government counsel conceded on the record that the motivation for seeking the search warrants was the "brick wall" presented by the filing of the motions to quash, even though DOJ guidelines state that "[t]he fact that the disinterested third party possessing the materials may have grounds to challenge a subpoena or other legal process is not in itself a legitimate basis for the use of a search warrant." 28 C.F.R. § 59.4.

The majority points out that the DOJ guidelines do not give rise to substantive rights. That may be so, but it is beside the point. The guidelines form a baseline from which to judge the reasonableness of unjustified deviations from the standard practices they outline. The guidelines are certainly relevant to the question before the district court, namely whether the government exhibited callous disregard for the rights of third parties. The guidelines plainly state that it is not legitimate to use a search warrant because a party may be challenging a subpoena; the government admitted that this was precisely the reason it issued the warrants in this case.

Further, as Judge Cooper found, the use of a search warrant to obtain documents from a third party is inappropriate. The

---

[6]Although we only have jurisdiction to review Judge Mahan's order, because the Quest search warrant was based, in part, on materials seized from CDT, an analysis of the propriety of the CDT warrants is necessary to a full analysis of whether Judge Mahan properly exercised his discretion in ordering the non-Balco samples seized from Quest returned.

Department of Justice Guidelines address this point specifi-cally:

> A search warrant should not be used to obtain docu-mentary materials believed to be in the private pos-session of a disinterested third party unless it appears that the use of a subpoena, summons, request, or other less intrusive alternative means of obtaining the materials would substantially jeopardize the availability or usefulness of the materials sought, and the application for the warrant has been authorized as provided in paragraph (a)(2) of this section.

28 C.F.R. § 59.4(a)(1); *see also* U.S. Attorney's Manual § 9-19.210.

The U.S. Attorney's Manual also provides that a search warrant should normally not be used to obtain confidential materials such as treatment records. §§ 9-19.220, 9-19.230.

The simple and undisputed fact is that the government deviated from its usual and appropriate protocol. Documents held in the possession of third parties are appropriately obtained through use of grand jury subpoena, not search war-rant. The record is quite clear that the government used the vehicle of a search warrant only because it thought its grand jury subpoenas might be contested. As the DOJ Guidelines recognize, that is an inappropriate use of a search warrant. Judge Mahan was entitled on the basis of the record to find that the government undertook this action in an attempt to prevent the Players Association and CDT from litigating the merits of their objections to the grand jury subpoenas and thus that the Quest search warrant was procured via tainted means.

Further, the entire record of the case shows a repeated pat-tern of the government attempting to prevent a full hearing on the merits of the Players Association legal challenges. In vir-tually each hearing in which CDT and the Players Association

articulated their objections, the government argued that another court had primary jurisdiction or that the action of another court dictated the result.[7] The record supports the district courts' collective conclusion that, as Judge Cooper put it, the government's actions constituted a "desperate effort to acquire evidence by whatever means could be utilized," by means of "quickly and skillfully moving the cup so no one can find the pea."

3

The record also supports the conclusion that the government made misleading statements in its application for search warrants and that the actions of the government in executing the search warrants were a mere pretext for inappropriately seizing confidential medical data about Major League Baseball players who were not under any particularized suspicion of criminal activity.

The application contained lengthy representations about how computer data could be destroyed and stated that "while not denying that they have the requested materials, CDT has declined to comply with the subpoena and has stated its intent to quash the subpoena." The affidavit did not disclose that CDT had agreed in writing to keep the data and other materials secured until the scope of the grand jury subpoena was set-

---

[7]To provide but a few examples: Before Judge White, who was considering the initial motion to quash, the government argued that he should defer ruling because he had no jurisdiction over the materials seized by the warrant. The government urged Judge Illston to wait to decide the Rule 41(g) motion until Magistrate Judge Johnson had ruled on the separate Rule 41(g) motion. The government urged Judge Johnson to consider that probable cause had already been established by the issuance of a search warrant by Magistrate Judge Lloyd. The government contended Judge Mahan lacked jurisdiction to order the property seized under the warrant returned because it had separately obtained a grand jury subpoena for the same item, urging him to wait until Judge White had ruled on the motion to quash (not disclosing that it had asked Judge White to defer until the Rule 41(g) motions had been decided).

tled, either through negotiation or a ruling on a motion to quash. The affidavit did not disclose that the Chief of the Criminal Division of the United States Attorney's Office had accepted the assurances in writing.

Rather, the affidavit justified removing computer data and equipment from the searched premises on the basis that:

> Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. . . . Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

The affidavit also informed the magistrate judge that "[c]omputer hardware and storage devices may contain 'booby traps' that destroy or alter data if certain procedures are not scrupulously followed." It noted that computer data was "particularly vulnerable to inadvertent or intentional modification or destruction."

As previously stated, the government did not have any evidence or reason to believe that CDT had engaged in any of this sort of conduct that might have jeopardized the evidence being sought. To the contrary, it had accepted in writing CDT's assurances "that CDT will maintain and preserve all

materials called for by the first subpoena as well as any materials called for by the new subpoena" and that "CDT would not destroy or alter any of the materials called for by either of the subpoenas." The plain import of the application was that CDT was improperly resisting compliance with a valid grand jury subpoena and data was in jeopardy of being destroyed. It implied that CDT was not being forthright about the information it possessed, when in fact there was no suggestion that CDT was attempting to mislead the government in any respect.

The search warrant application did not disclose that the Players Association, on behalf of the individuals whose medical files were at issue, had intervened and had joined CDT's motion to quash the grand jury subpoena. The application did not disclose the history of negotiations between the parties, and that the concern was about the breadth of the subpoena. The application did not disclose that the written assurances made by CDT and accepted by the government contemplated resolving the disputed issues through a motion to quash if necessary. Rather, the application implied that CDT was taking unjustified unilateral action.

The majority implies that the government constructed a careful search protocol carefully tailored to the CDT operation that it presented to the magistrate judges. However, the affidavits and protocol incorporate merely boilerplate language. Had the government disclosed to the magistrate judge that it intended, in the course of its search for material on a handful of players, to seize thousands of records pertaining to thirteen other major sports organizations, three unaffiliated business entities, and three sports competitions, and that the entity to be subject to the search had already segregated the responsive information for production, there is no doubt in my mind that the reaction of the judge would have been completely different.

Given these undisputed facts, the district courts were entitled to conclude that the government made misleading state-

ments in its applications for search warrants and that the actions of the government in executing the search warrants were a mere pretext for inappropriately seizing confidential medical data about Major League Baseball players who were not under any particularized suspicion of criminal activity.

### 4

Notwithstanding the government's bold and apparently deceptive tactics, the majority claims the government nonetheless complied with the terms of the warrants and therefore that Judge Mahan's ruling must be reversed.

First, this contention flies in the face of Judge Cooper's specific factual finding that the government did not comply with the terms of the warrant. She found that "the requirement of the Warrant that the seized items not covered by the warrant be first screened and segregated by computer personnel was completely ignored." As she elaborated:

> [T]he warrant did not require mere "consultation" and "participation" with computer personnel, but required computer personnel to actually make an initial review of computer equipment and storage devices to determine if they could be searched onsite, to determine whether it was practical to copy the data, and to seize and transport the equipment devices if necessary. The warrant required "appropriately trained personnel" to review the seized items to determine what data fell within the warrant. This clearly not the role [agent] Abboud played. The Court therefore considered this evidence and found it unconvincing in showing that the Government complied with the warrant.

Judge Cooper's factual finding, which we review for clear error, is amply supported by the record.

It is undisputed that, in anticipation of responding to the grand jury subpoena, CDT had already segregated the material about the specific individuals that was sought by the government. When agents arrived the President of CDT, Kim Jasper, informed the government that there was an envelope that contained the drug testing results, executed chain of custody forms, and laboratory reports for all ten of the players specified in the search warrant. When Jasper opened the box for the agents, they seized not only the envelope, but also computer disks and other material. They seized the material without examining it. One of the disks was completely blank.

Similarly, another CDT employee had created hard copy information responsive to the grand jury subpoena, which CDT provided to the government. The government wished to view the hard drive from which the information derived. CDT allowed them access and directed them to the subdirectory in the Tracey Directory were the Major League Baseball drug testing results were kept. The agents not only copied the subdirectory, but the entire Tracey directory which included thousands of obviously irrelevant material. The affidavit supporting the CDT search warrant explained that, if necessary, the agents could conduct an off-site search. Rather than seize on any of the opportunities presented to avoid the more-intrusive search, the agents proceeded to do everything possible to assure that result. In addition to rejecting CDT's offer to produce the responsive documents, the agents also declined to attempt any keyword searches to isolate responsive documents on site. The agents also ignored the fact that subdirectories containing files relevant to Major League Baseball were clearly labeled—as were the many subdirectories containing confidential information about other sports organizations—and instead seized the entire Tracey Directory.

The majority argues that "[t]he government should not be required to trust the suspect's self-labeling when executing a warrant." But CDT was not a suspect; it was a third party. The

majority, without any support in the record, goes on to place the independent laboratory in the category of criminal suspects, stating that "[l]ike most searched parties, CDT had an incentive to avoid giving over documents of which the government might be unaware and to read the search warrant as narrowly as possible."[8] What the undisputed record indicates is that CDT had already segregated the material in anticipation of cooperating with the government's grand jury subpoena; that CDT had assured the government in writing of its cooperation; and that the government had accepted those assurances. In the end, the proof is in the pudding. After examining all of the massive amount of seized data, after filing numerous declarations in support of the legitimacy of the government's search, and after much protesting about its suspicions about CDT, the government does not identify a single piece of information responsive to the warrant that CDT did not have already segregated and ready for production.

In short, the so called warrant protocol, relied on by the majority, was completely discarded, as Judge Cooper found. The government did not have a meaningful consultation with CDT officials about production of responsive material. It engaged in a wholesale dragnet operation indiscriminately gathering as much data as it could lay its hands on. The pretextual nature of the search was highlighted in later govern-

---

[8]The majority's unwarranted speculation as to the motivation of professional, independent laboratories to conceal information is belied by the DOJ Guidelines. Indeed, the DOJ computer search manual contemplates that "[s]ometimes, . . . [a] friendly employee or system administrator may agree to pinpoint a file or record or may have a recent backup, permitting the agents to obtain a hard copy of the files they seek while on-site." *See* Computer Crime & Intellectual Prop. Section, Criminal Div., U.S. Dep't of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*, pts. 1-2 at II.B.1.b. (2002), available at http://www.cybercrime.gov/s&smanual2002.htm (citing, e.g., *United States v. Longo*, 70 F. Supp. 2d 225 (W.D.N.Y. 1999) (upholding pinpoint search aided by suspect's secretary for two particular computer files)). Nonetheless, the searching agents rejected precisely that kind of assistance here.

ment affidavits, in which agent Novitsky argues that he believes he was entitled to seize data at the scene on athletes other than those identified in warrant under the plain view doctrine. Of course, he had previously averred to the magistrate judge that obtaining a list of the ballplayers' names correlated to the laboratory test numbers was justified "to ensure that samples of individuals not associated with Balco are left undisturbed."

Judge Cooper's factual finding that the government did not comply with the terms of the warrant is completely supported by the record.

Second, following the seizure, the government did not follow the *Tamura* procedure and did not follow the warrant protocol of segregating the non-responsive information. Rather, once off-site, instead of allowing only technical experts to segregate the responsive from the unresponsive data, the government allowed the lead investigator to peruse all of the material in the Tracey Directory, contrary to the specific instructions in the warrant. After examining the confidential information it had no right to see, the government then sought to sanitize its actions by asking another magistrate judge for a search warrant to examine the data it had already searched.

For decades, we have condemned the indiscriminate seizure of materials that are not responsive to a valid search warrant. In *Tamura*, we stated that "the wholesale *seizure* for later detailed examination of records not described in a warrant . . . has been characterized as 'the kind of investigatory dragnet that the fourth amendment was designed to prevent.' " 694 F.2d at 595 (quoting *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980)). *Tamura* held that "the government's wholesale seizure of company documents [is] illegal [when] the agents intentionally seize[ ] materials they [know] were not covered by the warrant." *United States v. Hill*, 322 F. Supp. 2d 1081, 1088 (C.D. Cal. 2004) (Kozinski, J., sitting by designation).

Under *Tamura*, where "documents are so intermingled that they cannot be feasibly sorted on site," we directed that law enforcement officers should "seal[ ] and hold[ ] the documents pending approval by a magistrate . . . ." *Id.* at 595-96. As we noted:

> The essential safeguard required is that wholesale removal must be monitored by the judgment of a neutral, detached magistrate. In the absence of an exercise of such judgment prior to the seizure in the present case, it appears to us that the seizure, even though convenient under the circumstances, was unreasonable.

*Id.* at 596 (footnote omitted).[9]

The *Tamura* protocol provides a sensible and practical approach to the problem posed by intermingled electronic records. It allows the government to seize the intermingled files, but not to view them until a neutral and detached magistrate has first reviewed the records. Indeed, had the *Tamura* protocol been followed, it is likely that the government would have obtained the information it sought with the warrants: complete drug testing and related information on the ten specified players.

If the government is going to be allowed to sift through reams of potentially unresponsive data in the digital context in order to identify responsive files, it cannot be allowed to

---

[9]The Tenth Circuit adopted the *Tamura* approach specifically in the computer context in *Carey*, holding that:

> Where officers come across relevant documents so intermingled with irrelevant documents that they cannot feasibly be sorted at the site, the officers may seal or hold the documents pending approval by a magistrate of the conditions and limitations on a further search through the documents.

172 F.3d at 1275.

use anything it finds to seek further warrants to retain that data when there is no independent probable cause to otherwise view it or retain it. To do so completely subverts the Fourth Amendment warrant requirement and allows the government to obtain post hoc justification for a search for which they had no probable cause to conduct before conducting it. Such a procedure invites an abuse of the off-site process that threatens both the privacy of computer data as well as the government's ability to reasonably search it.

The majority relies on *United States v. Adjani*, 452 F.3d 1140 (9th Cir. 2006), and *United States v. Hill*, but those decisions supply no support for a deviation from the *Tamura* procedure. In *Adjani*, in execution of a lawful warrant, investigators seized a computer owned by the defendant and a computer owned by his girlfriend, who was also a suspect. In sustaining the search of her computer, we reasoned that the government acts within the scope of the warrant when it seizes material that is "*both* related to the purposes of [the] search and [is] implicated . . . in the crime." *Id.* (emphasis added). Here, the government seized hundreds of records that were clearly outside the scope of the Balco-limited warrant, that were unrelated to the purposes of the Balco-limited search, and were indicative of no crime whatsoever. The materials seized at CDT were not related to the purpose of the search or implicated in the alleged crimes involving Balco.

*Hill* did not involve a seizure, but a challenge to an allegedly overbroad warrant. In contrast, this case is not about the overbreadth of the warrant but rather about whether the materials seized *and kept and used* by the government were within the scope of the warrant. *Id.* at 977 ("the officers' wholesale seizure was flawed here because they failed to justify it to the magistrate, not because they acted unreasonably or improperly in executing the warrant"). To the extent *Hill* is relevant, it declined to suppress material that was "described in and therefore taken pursuant to the valid search warrant." *Id.* (quoting *Tamura*, 694 F.2d at 597). In contrast, the records

sought by the MLBPA here that do not pertain to the ten named Balco-connected players were not described anywhere in the search warrant. Importantly, *Hill* specifically declined to address the question of intermingled files. 459 F.3d at 978 n.14.

Neither *Adjani* nor *Hill* address the question of intermingled files. *Tamura* did, however, and there is no dispute that the government did not follow the post-seizure *Tamura* protocol, as the district courts appropriately found. The majority's attempt to paper over this failure by suggesting the search was conducted in accordance with the warrant or justified by the issuance of subsequent search warrants based on the tainted seized information is unavailing.

In sum, the search did not comply with the warrant terms and the post-seizure conduct did not comply with *Tamura*. Thus, I must respectfully disagree with the majority's conclusion that the CDT search and seizure was conducted in accordance with the Fourth Amendment and our precedent governing electronic searches and seizures.

5

For all of these reasons, the district court's conclusion that the government acted in callous disregard of the rights of the players is completely supported by the record. The district courts made no error in finding that the first *Ramsden* factor was satisfied.

B

The second *Ramsden* factor is whether the movant has an individual interest in and the need for the property he wants returned. I agree with the majority and the district courts that the Players Association satisfied this requirement. At issue are the Fourth Amendment rights of the players. As we know, the Fourth Amendment protects people from unreasonable

searches and seizures into areas in which they have a legiti-
mate expectation of privacy. *Katz v. United States*, 389 U.S.
347, 360-61 (1967) (Harlan, J., concurring). There is no doubt
that the affected baseball players had a justified,
constitutionally-protected privacy interest in the seized prop-
erty, including the computer data and the physical urine sam-
ples. However, I believe that the majority significantly
discounts and underestimates the importance of the privacy
interests at stake.

The legitimate expectation of privacy in medical informa-
tion is as old as the Hippocratic Oath.[10] Indeed, "[o]ver the
last thirty years, the federal courts have uniformly accepted
the principle that medical records are private and entitled to
protection." Joel Glover and Erin Toll, *The Right to Privacy
of Medical Records*, 79 Denv. U. L. Rev. 540, 541 (2002). In
this context, the Supreme Court has recognized at least two
distinct kinds of constitutionally-protected privacy interests:
"One is the individual interest in avoiding disclosure of per-
sonal matters, and another is the interest in independence in
making certain kinds of important decisions." *Doe v. Attorney
General*, 941 F.2d 780, 795 (9th Cir. 1991) (quoting *Whalen
v. Roe*, 429 U.S. 589, 599-600 (1977)).

We have long applied *Whalen* and its progeny in holding
that "[i]ndividuals have a constitutionally protected interest in
avoiding 'disclosure of personal matters,' including medical
information." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531,
551 (9th Cir. 2004); *see also Norman-Bloodsaw v. Lawrence
Berkeley Laboratory*, 135 F.3d 1260, 1269 (9th Cir. 1998)
("The constitutionally protected privacy interest in avoiding
disclosure of personal matters clearly encompasses medical
information and its confidentiality."); *Yin v. California*, 95

---

[10]Stedman's Medical Dictionary, 799 (26th ed. 1995) ("All that may
come to my knowledge in the exercise of my profession or outside of my
profession, or in daily commerce with men, which ought not to be spread
abroad, I will keep secret and will never reveal.")

F.3d 864, 870 (9th Cir. 1996) (noting that "individuals have a right protected under the Due Process Clause of the Fifth or Fourteenth Amendments in the privacy of personal medical information and records."); *Doe*, 941 F.2d at 795-96 (holding that an individual has privacy interest in medical information, including diagnosis); *Caesar v. Mountanos*, 542 F.2d 1064, 1067 n.9 (9th Cir. 1976) (noting that the right to privacy encompasses the doctor-patient relationship). As we have observed, "[o]ne can think of few subject areas more personal and more likely to implicate privacy interests . . . ." *Norman-Bloodsaw*, 135 F.3d at 1269.

If there were any doubt, the Supreme Court held in *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001), that individuals enjoyed a reasonable expectation of privacy in medical test results and that "the results of those tests will not be shared with nonmedical personnel without [the patient's] consent."

Congress has also recognized the importance of privacy in medical records in a variety of contexts, most prominently in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (1996).[11]

---

[11]HIPAA was far from Congress's first foray into privacy protection. As the United States Department of Heath and Human Services noted:

> In the 1970s, individual privacy was paramount in the passage of the Fair Credit Reporting Act (1970), the Privacy Act (1974), the Family Educational Rights and Privacy Act (1974), and the Right to Financial Privacy Act (1978). These key laws were followed in the next decade by another series of statutes, including the Privacy Protection Act (1980), the Electronic Communications Privacy Act (1986), the Video Privacy Protection Act (1988), and the Employee Polygraph Protection Act (1988). In the last ten years, Congress and the President have passed additional legal privacy protection through, among others, the Telephone Consumer Protection Act (1991), the Driver's Privacy Protection Act (1994), the Telecommunications Act (1996), the Children's Online Privacy Protection Act (1998), the Identity Theft and

In the regulations promulgated pursuant to HIPAA, the United States Department of Health and Human Services emphasized the importance of maintaining the privacy of medical information, concluding that "[p]rivacy is a fundamental right" and that "[a] right to privacy in personal information has historically found expression in American law."[12] 65 Fed.Reg. at 82,464.

In sum, given controlling legal authority, there is no question that the baseball players who participated in the random testing had a justified expectation of privacy in the test results and, in particular, that the test results would not be disclosed.[13]

---

Assumption Deterrence Act (1998), and Title V of the Gramm-Leach-Bliley Act (1999) governing financial privacy.

In 1997, a Presidential advisory commission, the Advisory Commission on Consumer Protection and Quality in the Health Care Industry, recognized the need for patient privacy protection in its recommendations for a Consumer Bill of Rights and Responsibilities (November 1997). In 1997, Congress enacted the Balanced Budget Act (Public Law 105-34), which added language to the Social Security Act (18 U.S.C. 1852) to require Medicare+Choice organizations to establish safeguards for the privacy of individually identifiable patient information. Similarly, the Veterans Benefits section of the U.S. Code provides for confidentiality of medical records in cases involving drug abuse, alcoholism or alcohol abuse, HIV infection, or sickle cell anemia (38 U.S.C. § 7332).

*Standards for Privacy of Individually Identifiable Health Information*, 65 Fed.Reg. 82,462, 82,469 (Dec. 28, 2000) (codified at former 45 C.F.R. pts. 160, 164 (2002)).

[12]The Department also emphasized that "While privacy is one of the key values on which our society is built, it is more than an end in itself. It is also necessary for the effective delivery of health care, both to individuals and to populations. . . . The need for privacy of health information, in particular, has long been recognized as critical to the delivery of needed medical care." 65 Fed.Reg. at 82,467.

[13]That the athletes had a justified, reasonable expectation of privacy in the urine samples themselves that were seized by the government is beyond question. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 615-617 (1989) ("it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . .").

Of course, under appropriate circumstances, justified privacy expectations may be altered by contract. *Yin*, 95 F.3d at 872. In this instance, the ballplayers' privacy expectations were heightened, not diminished, by the collective bargaining agreement between the Major League Baseball Players Association and Major League Baseball. The agreement was forged after years of impasse concerning steroid testing and, as I have discussed, called for anonymous testing to determine the scope of the steroid abuse problem. To that end, the agreement provided, in relevant part that:

> 1.    During the 2003 season (which shall include spring training but not include the post-season), all Players will be subject to two tests (one initial test and one follow-up test conducted not less than five and not more than seven days following the initial test) at unannounced times for the presence of Schedule III steroids ("Survey Testing"). In addition the Office of Commissioner shall have the right to conduct additional Survey Testing in 2003 in which up to 240 players, selected at random, may be tested.

> 2.    If the results of the Survey Testing conducted in 2003 show that more than 5% of Players tested test positive for Steroids, all Players will be subject to two unannounced tests (an initial test and a followup test five to seven days later) for Steroids during the 2004 season ("Program Testing"). If a Player tests positive in the Program Testing, he shall immediately be placed on the Clinical Track and shall be subject to discipline for further violations. The Program Testing shall continue each season until less than 2.5% of the Players tested test positive for Steroids for two consecutive seasons combined.

In short, the only objective of the 2003 testing was to ascertain whether the threshold had been exceeded; it was not intended to test and monitor individual baseball players.

Indeed, the testing protocol was designed to prevent the identification of individual players and the matching of players with test results. The record does not reflect whether any individual player was even informed of his testing results for the 2003 sample year.

The collective bargaining agreement contains numerous provisions assuring confidentiality. For example, the section concerning the testing protocol provides:

> The confidentiality of the Player's participation in the Program is essential to the Program's success. Except as provided in Section 8, the Office of the Commissioner, the Association, HPAC, Club personnel, and all of their members, affiliates, agents, consultants and employees are prohibited from publicly disclosing information about the Player's test results, Initial Evaluation, diagnosis, Treatment Program (including whether a Player is on either the Clinical or Administrative Track), prognosis or compliance with the Program.

The collective bargaining agreement specified in great detail the manner of collection of data and, in particular provided that:

> At the conclusion of any Survey Test, and after the results of all tests have been calculated, all test results, including any identifying characteristics, will be destroyed in a process jointly supervised by the Office of the Commissioner and the Association.

The record contains many more references to the assurance given Major League Baseball players that the 2003 tests would be anonymous and kept confidential, which are unnecessary to detail. There simply is no doubt whatsoever that the players had a justified, constitutionally protected privacy interest in the test results — an interest that was further

enhanced by the many protections and contractual obligations contained in the collective bargaining agreement under which the tests were conducted.

In sum, the players had a significant privacy interest in the medical records and physical specimens. There is no doubt that the players have an individual interest in and a need for the property to be returned. Thus, the second *Ramsden* factor is satisfied.

### C

I agree with the majority and the district courts that the players would be irreparably injured by denying the return of property. As the majority notes, the government has already conceded that the players have no adequate remedy at law for the redress of their grievances. Therefore, the third and fourth *Ramsden* factors are satisfied.

For these reasons, I agree with the majority that the district courts properly exercised equitable jurisdiction. However, I would hold that the district courts correctly found that all four *Ramsden* factors were satisfied. I disagree with the majority that the government's actions properly respected the privacy rights of the players.

### V

We review a district court's decision to exercise its equitable jurisdiction under Rule 41(g) under the deferential abuse of discretion standard. *Ramsden*, 2 F.3d at 324. I not only fail to see any abuse of discretion in the decision by the district courts to exercise equitable jurisdiction, I agree entirely with their conclusions that the seized property should be returned.

The Advisory Committee Notes to the 1989 amendments to Rule 41(g) tell us that "reasonableness *under all of the circumstances*" should be the governing standard for determin-

ing whether property should be returned. (emphasis added). Those same notes state that "[i]f the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable," but that "in certain circumstances . . . equitable considerations might justify requiring the government to return or destroy all copies." *Id.*[14]

Deciding between the two hinges on "whether the Government's conduct was sufficiently reprehensible in this case to warrant this sanction." *Ramsden*, 2 F.3d at 327. As the actions I have discussed make clear, the government's behavior was sufficiently reprehensible and the privacy interests of the players who were neither named in the warrant nor implicated in any criminal activity are sufficiently important to affirm the granting of the 41(g) motions. Simply put, there is no reason for the government to retain confidential medical information and bodily fluids of citizens who are not under any particularized suspicion of criminal activity.

VI

For similar reasons, I would also affirm Judge Illston's decision to quash the May 6, 2004, subpoenas. The majority contends that Judge Illston abused her discretion by resting her decision to quash the subpoenas on legally insufficient grounds, citing *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847 (9th Cir. 1991), for the proposition that subpoenas and search warrants serve different purposes and therefore arguing that it cannot be considered an abuse to use both methods of obtaining information. However, in this case,

---

[14]The cases the majority cites for the proposition that return of property is inappropriate when the government still needs it as evidence are hardly analogous to the present case. In both *United States v. Mills*, 991 F.2d 609, 612-13 (9th Cir. 1993), and *United States v. Fitzen*, 80 F.3d 387, 388-89 (9th Cir. 1996), the person seeking return of the property was the criminal defendant himself, not an innocent third party, and the court found in both cases that the defendants didn't even have a legitimate claim of ownership to the property.

the government's conduct went beyond seeking warrants and subpoenas for the same information at the same time. As discussed previously, the government alternately sought subpoenas and warrants to obtain highly sensitive information from every Major League Baseball player and to continue to keep that information after being ordered to return it. Further, as previously noted, there were no substantiated risks justifying the use of a warrant to obtain the documentary evidence from a third party under 28 C.F.R. § 59.1(b).

In addition, it is worth noting that the May 6 subpoenas requested much of the same information sought in the April 30 and prior search warrants. The affidavit to obtain the April 30 search warrant from Judge Lloyd averred that the material was necessary in part because the records may "establish a link to the charged defendants in this case." It is an abuse of the grand jury process to use grand jury subpoenas to develop post-indictment trial material. *See, e.g.*, *In Re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985) (timing of subpoena, first issued after indictment, suggested that its purpose was to obtain trial material). The Balco indictments were returned in February. Therefore, the issuance of the May 6 grand jury subpoena, following on the heels of the search warrant application for the same information indicating that its partial purpose was to develop links to Balco, suggests an abuse of grand jury process.

Given the history of this case, the district court's conclusion that the filing of these subpoenas was "the culmination of a series of actions taken by the government in order to prevent the MLBPA and CDT's attempt to move to quash the January and March subpoenas" is fully supported by the record and certainly cannot be said to be an abuse of discretion.

## VII

Although I have detailed why I believe the findings and conclusions of the district court should be sustained on

appeal, I cannot leave the matter at hand without discussing the larger implications of this case.

A

The principle at stake in this case is relevant in countless modern scenarios in which data responsive to a warrant is intermingled with private, unresponsive data. The result of the majority's holding is that the government has been permitted to seize confidential medical information pertaining to individuals not under any criminal suspicion. The majority's holding that the government was entitled to seize all records in computerized files and subsequently search the records without probable cause puts Americans' most basic privacy interests in jeopardy. Approving of the tactics employed here would entitle the government to seize the medical records of anyone who had the misfortune of visiting a hospital or belonging to a health care provider that kept patient records in any sort of master file which also contained the data of a person whose information was subject to a search warrant. I agree entirely with Judge Illston's observation that the implications of approving such behavior are staggering. Under the majority's holding, no laboratory or hospital or health care facility could guarantee the confidentiality of records.[15]

---

[15]This is why, even when large sets of data need to be sorted to find material responsive to a warrant, that task is assigned to a computer specialist and not the agents tasked with conducting the investigation. The majority fails to see the relevance of this role division, but it is evident here. Had a computer specialist sorted the data as prescribed by the warrant, it is unlikely he or she would have extracted non-responsive records and then used them to apply for further warrants seeking access to test results beyond the scope of the initial investigation. Instead, Agent Novitzsky, who was tasked with leading the investigation, viewed material he was not supposed to see and used it for purposes for which the warrant was never initially intended. If the warrant had intended to authorize *any* agent to examine the intermingled data, it would not have gone out of its way to specify that only certain agents were permitted to engage in that task.

The majority attempts to discount this possibility, but offers no principled reason why it does not apply in hundreds of other contexts. Indeed, under questioning from the district judges, the government itself did not discount the possibility of other widespread searches.[16]

---

[16]For example, a hearing before Magistrate Judge Johnson contained the following colloquy between government counsel and the Court:

Court:    * * * If there is some other drug testing lab apart from CDT, would you ever use — but the test for the ten were at CDT. Would you ever use this information to go and say — just demand that you can get the drug testing results from other labs that test professional athletes. . . . Based on the theory that it's systemic. And so there's a problem, there's a problem. And we know that these other labs test athletes, too. So can you just go search?

Counsel:    Yes, your honor.

Similarly, in another hearing Judge Illston asked government counsel whether he thought it was possible to take the information from the Tracey directory concerning other sports organizations and use individual test results of athletes to launch another investigation. Strikingly, Judge Illston posed it as a hypothetical, but the government did not appear to deny that officers may have viewed individual records in other sports:

Court:    What if hockey had a subdirectory that had positive results and he clicked on it to make sure it was what it said it was, by George, that's what it was, what about that?

Counsel:    I don't know in checking to make sure it was hockey that didn't happen. If it did happen, I would think that theoretically Agent Novitsky would have the right to either request a search warrant or, I suppose, if you looked at it enough, it's possible that it was obvious, it was plain view, it was other drug use by hockey players. So there might be a legal entitlement for Agent Novitzsky to use that and do something with it. It hasn't happened in this case. I suppose that's theoretically possible, again, you would have, I believe, probable cause to believe that evidence in there would lead to other persons potentially involved in disputable criminal drugs, which is the crime that's under investigation.

The importance of this threat to our nation's medical community cannot be overstated. In order to provide better and more efficient heath care, doctors and hospitals have rapidly embraced a variety of methods for sharing confidential patient information electronically. Computerized physician order entry, for example, allows doctors to transmit treatment instructions widely throughout a health care computer network so that nurses, therapists, pharmacists, radiologists and pathologists have instant and accurate access to the instructions. Computerized electronic record transmission decreases delay, reduces costs, and minimizes errors. But it does involve extensive electronic co-mingling of patient data throughout computer networks.

Likewise, mass electronic transmission and storage of confidential medical records is now ingrained in the health insurance industry. Electronic access allows more efficient and timely determination and payment of medical insurance benefits.

The federal government has taken an affirmative role in promoting national patient data access. In 2004, for example, the President created the Office of National Coordinator for Health Information Technology in order to develop and implement a nationwide infrastructure to allow the communication and exchange of health care data between different information technology systems. Executive Order 13335, 2004 WL 911114 (Pres.Exec.Order), 69 FR 24059 (2004).

The simple fact is that the majority of confidential medical information in the United States consists, in one fashion or another, of co-mingled electronic data. To endorse the government's position that probable cause as to one patient's records justifies the seizure of all co-mingled records would mean that the Fourth Amendment does not afford any meaningful protection at all for our citizens' most private information.

B

As the Players Association and Amicus Chamber of Commerce have effectively argued, today's decision will also significantly impair the ability of employers to promote voluntary drug testing in the workplace. Employers are not permitted unilaterally to impose workplace drug testing on employees subject to a collective bargaining agreement. *United Foods & Commercial Workers v. Foster Poultry Farms*, 74 F.3d 169, 174 (9th Cir. 1995) ("there is no indication in the relevant statutes, the legislative history, or the regulations themselves that the drug testing requirements were intended to preempt already existing collective bargaining agreements or to eliminate an employer's duty to bargain under federal labor laws."). If the government may violate the confidentiality promised employees in collective bargaining agreements without any suspicion of criminal activity and simply seize confidential test records in the hope of finding incriminating information, no sensible union will agree to allow its employees to be tested. Therefore, although the government proceeds here under an apparent mission to root out all steroid use in baseball, and perhaps other sports, the result of its tactics will be quite the opposite. Without mandatory testing, any steroid policy will be but an empty aspirational goal. If today's decision stands, it is difficult to imagine any sports union agreeing to drug testing in collective bargaining negotiations. The implications for employee testing in all industries are obvious.

C

Finally, today's decision marks the return of the prohibited general warrant through an endorsement of a disguised impermissible general search warrant—a tactic we rejected in *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978). Indeed, as the Supreme Court has observed, "[i]t is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that

motivated the framing and adoption of the Fourth Amend-
ment." *Payton v. New York*, 445 U.S. 573, 583 (1980). It was
for this reason that the particularity requirement in warrants
was adopted. As the Court noted in *Maryland v. Garrison*,
480 U.S. 79, 84 (1987):

> The Warrant Clause of the Fourth Amendment cate-
> gorically prohibits the issuance of any warrant
> except one "particularly describing the place to be
> searched and the persons or things to be seized." The
> manifest purpose of this particularity requirement
> was to prevent general searches. By limiting the
> authorization to search to the specific areas and
> things for which there is probable cause to search,
> the requirement ensures that the search will be care-
> fully tailored to its justifications, and will not take on
> the character of the wide-ranging exploratory
> searches the Framers intended to prohibit.

The majority allows the government to circumvent these
important Fourth Amendment principles by allowing the gov-
ernment to use boilerplate computer search language in a war-
rant to justify the seizure and subsequent warrantless search
of massive amounts of data not responsive to the warrant. In
doing so, the majority has allowed the government with the
wave of a computer curser to transform a limited search war-
rant into an impermissible general warrant.

## VIII

I also cannot leave our consideration of this case without
addressing the actual argument made by the government in
justifying its actions. The government did not advocate the
position adopted by the majority. The government's sole justi-
fication for the warrantless seizure of the data of the unlisted
players is that it was in "plain view," which is one of the lim-
ited exceptions to the Fourth Amendment's warrant require-
ment. Although the majority did not reach this question, the

theory formed the entire basis for the government's legal justification for its actions and was the primary focus of the proceedings before the district courts. Therefore, it is important to address it to demonstrate the soundness of the various decisions by the district courts.

The plain view doctrine is based on the assumption that if there is probable cause for the search, and the officer is legally entitled to be at the premises under the Fourth Amendment, seizure of an object in plain view that is contraband or evidence of a crime does not involve an invasion of privacy. *Payton*, 445 U.S. at 586-87. The Supreme Court has identified several conditions that must be satisfied before a plain view seizure of an object is upheld: (1) the officer conducting the seizure must lawfully arrive at the position from which the object is plainly seen; (2) the object must be in plain view; (3) the object's incriminating character must be "immediately apparent," that is, the officer must have probable cause to believe the object is contraband or evidence of a crime; and (4) the officer must have a lawful right of access to the object itself. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *Horton*, 496 U.S. at 136-37; *Texas v. Brown*, 460 U.S. 730, 737 (1983).

Under the circumstances presented by this case, not only is it clear that the government had not met its burden of establishing that the seizure of the data was justified under the plain view doctrine, but it is also clear why the plain view doctrine would be inappropriate to apply in the computer context.

A

The fundamental requirement of the plain view doctrine is that the object seized be in "plain view," that is, "obvious to the senses." *United States v. Sifuentes*, 504 F.2d 845, 848 (4th Cir. 1974). After an extensive colloquy, Judge Illston concluded that the computer data seized was not in "plain view."

Not only is this factual conclusion not clearly erroneous, the undisputed record completely supports her conclusion under any standard of review.

As Judge Illston pointed out, this was not a case in which an incriminating photo or similar evidence could be viewed on a computer screen; rather, at best, it involved scrolling through thousands of records none of which were immediately visible. In its application for a search warrant, the government justified removal of data and computer equipment on the basis that:

> The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

The government also indicated in its affidavit that it would be using consulting computer specialists to analyze the data. The affidavit explained:

> Searching computer systems is highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impractical to bring to the search site all of the necessary technical manuals and specialized equip-

ment to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer software application or operating system that is being searched.

According to the government, the search of the computers at CDT could not be completed at the scene. There were, in fact, 16 computers. However, one computer was eventually isolated and data retrieved. As Special Agent Novitsky's memorandum of activity stated:

> At approximately 2:35 p.m., S/A Abboud began working on a computer with [a CDT employee]. [She] directed us to a computer in the office labeled "E" for purposes of the search warrant and sketch. At this computer, [she] identified a sub-directory entitled "Tracey", which she said contained all of the computer documents for CDT's sports drug testing division. A cursory review of the subdirectory indicated multiple further subdirectories and several hundred computer files. As authorized by the warrant, because of the length of time it would take to search each file and the intrusiveness it would cause on CDT, it was decided to make a complete copy of the "Tracey" subdirectory in order to perform a search of it in the IRS-CID offices at a later time.

Agent Novitsky later explained in a subsequent affidavit that:

> This subdirectory contained hundreds of files and a significant amount of computer data. After consulting with agents at the scene specifically trained in the search of computers, we determined that we could not realistically search the entire directory on-site in a reasonable amount of time. We therefore

made the determination to copy the entire sub-directory.

After it was examined, the Tracey directory itself was determined to contain 2,911 files, with an unknown amount of data in each file, that were not connected with Major League Baseball player drug testing at all. In the files that concerned Major League Baseball players, there was information on approximately 1,200 players, with multiple test results.

Given these circumstances, the data seized cannot be considered to be in "plain view." As the Supreme Court has noted, "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object — *i.e.,* if its incriminating character is not immediately apparent, the plain view doctrine cannot justify its seizure." *Dickerson*, 508 U.S. at 375 (alterations and quotations omitted). The data now sought by the government was not "obvious to the senses" at the scene, nor were the positive tests in "plain view" from a glance at a computer screen. The data required analysis and thorough examination off-site before the data at issue was discovered.

The "plain view" doctrine is inapplicable in the general electronic context because it is at complete odds with the underlying theory of the doctrine. As the Supreme Court has explained:

> The theory of that doctrine consists of extending to nonpublic places such as the home, where searches and seizures without a warrant are presumptively unreasonable, the police's longstanding authority to make warrantless seizures in public places of such objects as weapons and contraband. And the practical justification for that extension is the desirability of sparing police, whose viewing of the object in the course of a lawful search is as legitimate as it would

> have been in a public place, the inconvenience and risk—to themselves or to preservation of the evidence—of going to obtain a warrant.

*Horton*, 480 U.S. at 326-27 (internal citations omitted).

Neither of those considerations is present when we consider the off-site examination of electronic data. As the government essentially acknowledged in its search warrant applications, examination of computer data is a forensic exercise. It necessarily involves the application of software to interpret the data; without external software aid, the data would appear only as binary numbers. In addition, as in this case, the government often requires computer specialists to decipher the data. Electronic data is simply not the kind of evidence that forms a natural extension of an officer's discovery of obvious contraband in a public place. The fact that further careful electronic assistance is required outside the searched premises to interpret the data belies the "practical" justification that there is insufficient time to obtain a warrant. Indeed, electronically assisted searches of binary numbers bear a closer resemblance to the thermal imaging searches of homes that the Supreme Court rejected as violative of the Fourth Amendment in *Kyllo v. United States*, 533 U.S. 27 (2001).

The ultimate fact that, after the assistance of electronic software programs, the data may be observed "in plain view" does not alter this conclusion. As the Supreme Court has warned:

> [I]n the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

*Coolidge*, 403 U.S. at 465.

The off-site forensic examination of computer data is simply not one of those circumstances that fits the "plain view" paradigm. Indeed, to hold otherwise would be to write out the Fourth Amendment's particularity requirement with respect to electronic data and to transform particularized search warrants into general search warrants, with the government authorized to conduct indiscriminate, dragnet searches.

B

The government also failed to sustain its burden to establish the plain view exception because, as the district courts found, the incriminating character of the information was not "immediately apparent." It was clear under the testing protocol that positive tests did not necessarily reflect steroid use; the use of nutritional supplements—which is common in professional sports—could yield a false positive. In addition, there are a whole host of legitimate reasons for individuals to be prescribed steroid products. The CDT testing was not undertaken to test individual players; but rather to provide a survey for the possible establishment of an individual drug testing protocol.

The government relied on sheer speculation that the presence of positive steroid markers would mean that the athlete had received steroids without prescription from some unknown person. The crime that the government was interested in pursuing was the illegal *distribution* of steroids. The evidence of a positive test was not affirmative evidence of any distribution. The government's theory was that, armed with the test results, the government could then summon the athlete before a grand jury to see if it could obtain evidence from whom and under what circumstances the athlete may have obtained steroids.

However, the mere suspicion of criminal activity or the suspicion of knowledge of a criminal activity is not sufficient to

sustain a seizure of evidence under the plain view doctrine. As the Supreme Court has made abundantly clear, the "immediately apparent" requirement means that the law enforcement officer must have *probable cause* to seize the property that the officer observed in plain view. As the Court explained:

> We now hold that probable cause is required. To say otherwise would be to cut the "plain view" doctrine loose from its theoretical and practical moorings. . . . Dispensing with the need for a warrant is worlds apart from permitting a lesser standard of *cause* for the seizure than a warrant would require, i.e., the standard of probable cause. No reason is apparent why an object should routinely be seizable on lesser grounds, during an unrelated search and seizure, than would have been needed to obtain a warrant for that same object if it had been known to be on the premises.

*Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987).

The government conceded that it did not have probable cause to search or seize any data or specimens beyond what was relevant to the ten players listed in the warrant. For those players, the government provided extensive information showing their alleged connection to Balco. However, the government conceded that it had *no* information connecting any of the other players to Balco. Indeed, it made that clear in both its affidavits and subsequent hearings. The affidavit provided to Judge Lloyd speculated that evidence might be developed linking the players who tested positive to Balco "because of the closely-knit professional baseball community," but also speculated that the positive test results could suggest "another significant source of illegal performance-enhancing drugs." In fact, the government tendered no evidence whatsoever in support of either theory. The government did not have any information concerning who might be

involved in any distribution scheme; in fact, it had no idea at all.[17]

The government did not submit any evidence contradicting the affidavits indicating the possibility of false positives and that a positive result did not necessarily indicate illegal steroid use. There was no specific target of the investigation against whom the government sought incriminating evidence.

Mere speculation is not sufficient to establish probable cause. *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987). Perhaps the government had reasonable suspicion, but that is not sufficient to justify a seizure under the plain view doctrine. *See Hicks*, 480 U.S. at 326 (holding that "probable cause is required"); *Payton*, 445 U.S. at 587 (explaining the plain view requirement that there be "probable cause to associate the property with criminal activity.").

The government's plain view theory cannot justify its actions in this case.

IX

I concur in the majority's conclusion that the media has standing on appeal to file a motion to unseal records. I also agree that, under the circumstances presented by this case, the motion should be referred to the district courts on remand.

I write separately to comment on what I view as a regrettable effort by both parties in the district courts to circumvent

---

[17]For example, the government engaged in the following colloquy at one hearing:

Counsel:    Your honor, it's evidence because it's evidence of an illegal distribution of steroids to other people.

Court:    From where?

Counsel:    From where? That's an excellent question, and that is why we need the evidence.

the procedures we have established to balance the First Amendment rights of the press with the confidentiality that is required for some criminal proceedings.[18] Specifically, I note that all of the district court proceedings were closed by insistence of the parties, without notice to the press or public.

In some instances, courtroom closures were obtained without prior notice to the district court itself. For example, the transcript of one of the hearings before one of the district court judges reflects the following colloquy:

> Court:    Why is that, that you are locking the door?
>
> Clerk:    Since the case was filed under seal.
>
> Court:    Is this all under seal? * * * You want the hearings under seal. There was no motion made to seal the hearing. I wasn't aware you wanted it that way.
>
> Counsel: Your honor, we filed the pleadings under seal. We think this proceeding should be under seal. The information at issue is highly confidential.

After some colloquy, the court allowed the courtroom to be sealed, but admonished counsel to file an appropriate motion if they wished any further courtroom proceedings to be closed in the future. However, neither the public nor the press were notified that the doors were to be locked and the public barred.

"Under the first amendment, the press and the public have a presumed right of access to court proceedings and docu-

---

[18]The government and the Players Association also sought to have oral argument in the court of appeals closed to the public. We denied that motion, and a subsequent motion for reconsideration.

ments." *Oregonian Pub. Co. v. District Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) (citing *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1985)("*Press-Enterprise I*")). "This presumed right can be overcome only by an overriding right or interest 'based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Id.* (quoting *Press-Enterprise I*, 464 U.S. at 510)

In determining questions of public and press access to the courts, courts are to examine whether a right attaches to a particular proceeding, using the Supreme Court's "logic and experience" test articulated in *Press-Enterprise v. Superior Court of California for the County of Riverside*, 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise II*"). "If a proceeding fulfills both parts of the test, a qualified First Amendment right of access arises, to be overcome 'only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Phoenix Newspapers, Inc. v. District Court*, 156 F.3d 940, 946 (9th Cir. 1998) (quoting *Press-Enterprise II*, 478 U.S. at 9-10). Provisions for narrow tailoring may include later release of transcripts, or redacted transcripts. *Id.* at 947.[19] In making its decision to close proceedings, "[t]he trial court must articulate this interest 'along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " *Id.* at 946-47. None of these procedural steps were undertaken in the district courts.

To be sure, the right of access to court proceedings is not absolute. *Id.* at 946. Both parties have legitimate privacy interests to protect. The Federal Rules of Criminal Procedure require "matters affecting a grand jury proceeding to be closed to the extent necessary to prevent disclosure of matters occurring before a grand jury." Fed. R. Crim. P. 6(e)(5). In addition, as I have discussed, the athletes represented by the

---

[19]Indeed, transcripts of court proceedings "must be released when the factors militating in favor of closure no longer exist." *Id.* at 947-48.

Players Association have a very strong privacy interest in their medical records. However, there are non-grand jury materials involved in this case, and there are some proceedings that do not appear to have involved confidential material.[20]

In any case, these are matters best considered in the first instance by the district court, with public notice so that the First Amendment right of access may be balanced with the privacy interests of the parties. Unfortunately, the parties presented hearing closure and record sealing as a *fait accompli* to the district courts, without notice to the press or public. Now that we have remanded the motion to unseal, this issue may be addressed.

## X

In discussions of the use of alleged use of steroids by baseball players, much is made about "the integrity of the game." Even more important is the integrity of our legal system. Perhaps baseball has become consumed by a "Game of Shadows,"[21] but that is no reason for the government to engage in a "Prosecution of Shadows." The district judges were entirely right to order the government to return the thousands of private medical records it wrongfully seized by use of pretext and artifice.

I would affirm the orders of the district court and must

---

[20]The government, in at least one proceeding, seemed to indicate that it might not oppose unsealing some material, with government counsel stating before Judge Mahan: "As a matter of DOJ regulation and policy, we actually have taken the position and we do take the position that there isn't a need to have these proceedings actually sealed, and that is because of the paramount interest in having actual public proceedings in courtrooms held in public." However, the government did not object formally to sealing the transcript of that hearing, and the transcript has, to date, been sealed.

[21]Mark Fainaru-Wada and Lance Williams, *Game of Shadows* (2006).

respectfully dissent from the majority's contrary conclusion. I concur in the remand of the motion to unseal records.